COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| PHARAOH OIL & GAS, INC., | § | No. 08-10-00144-CV |
| Appellant, | § | |
| | § | Appeal from the |
| V. | § | 112th District Court of |
| | § | of Crockett County, Texas |
| RANCHERO ESPERANZA, LTD., | § | |
| Appellee | § | (TC# 08-09-07081-CV) |
| | § | |

## **O P I N I O N**

Pharaoh Oil & Gas, Inc. brings this accelerated appeal from a temporary injunction granted in favor of Ranchero Esperanza, Ltd. We reverse the injunction order and remand for trial on merits.

Since late 2004, Ranchero has been the owner of the surface estate and one-half of the mineral estate in a 20,000-21,000 acre ranch located in Crockett County, Texas. Approximately one year after Ranchero acquired its interest, Pharaoh began operating oil and gas wells on multiple sections of the Ranch. The wells had previously been owned and operated by William Tidwell since March of 1982.

Ranchero filed suit in 2008 alleging that Pharaoh was using land located on Section 18, which it referred to as the "Top Yard," and Section 2, which it referred to as the "Bottom Yard," for storage of equipment and materials not being put to current use for the production of minerals from the specific oil and gas leases associated with the surface lands on which the Top and

Bottom Yards are located.[1] Ranchero alleges that storage of the equipment and materials was causing a loss of vegetation in the pasture and would contribute to soil erosion. Additionally, the pleadings allege that the oilfield equipment would likely leak fluids onto the surface damaging it. The suit includes claims for trespass, violation of Texas Railroad Commission rules, unreasonable use of the surface, and negligence. Ranchero also sought a temporary injunction prohibiting Pharaoh from storing the equipment and materials on the Ranch when it is not being put to immediate use for the purpose of exploring for, producing, or marketing oil and gas from the lease where the equipment is situated. The hearing on the temporary injunction application was not held until April 21, 2010.

At the temporary injunction hearing, Ranchero introduced evidence showing that the Texas Railroad Commission had, on April 28, 2009, issued an order requiring Pharaoh to plug, sever, and seal all of the open wells in Section 18. Kenneth Hartman, the ranch foreman, testified that the Ranch is currently a recreational hunting ranch. The Ranch is participating in a brush management program with the Natural Resource Conservation Service (NRCS). Additionally, Texas A&M had been on the Ranch for two years studying wildlife and vegetation. The Ranch was also conducting deer surveys as part of a Texas Department of Parks and Wildlife program with the goal of promoting the deer population on the Ranch.

Prior to becoming the ranch foreman, Hartman had worked for Marathon Oil for twenty years as a pumper. From that experience, Hartman was familiar with the customary operation of oil wells. Hartman photographed the equipment and materials located on both the Top and

---

[1] The Top Yard is located adjacent to the A.C. Hoover Well No. 10 (API# 105-32285) on Section 18, Block 1, GC&SF Ry. Co. Survey. The Bottom Yard is located adjacent to the Big State Ranch 2M Well No. 1 (API# 105-33357), on Section 2, Block FF, A.C. Hoover Survey.

Bottom Yards and twenty-seven of these photographs were introduced into evidence. Plaintiff's Exhibit 7 consists of twelve photographs of the Top Yard taken between March 4, 2010 and March 31, 2010. Hartman noted that a rusted out tank, casing, sucker rods, pipe rack, pump jacks, scaffolding, and swab units depicted in some of the photographs had been moved to the Top Yard from the Bottom Yard during this same time period. Other equipment, including rusted barrels containing unknown fluids, were also stored on the Top Yard near a storage building. Hartman found evidence of leakage around these barrels. The photographs also showed that Pharaoh had used a backhoe on March 22, 2010 to clear away vegetation and trees in order to expand the size of the Top Yard. According to Hartman, none of the equipment and materials stored on the Top Yard was necessary for plugging a well. Further, the equipment and materials were not being used for any current operations.

Section 2, on which the Bottom Yard is located, has only one active well on it. Plaintiff's Exhibit 8 consists of eight photographs of the Bottom Yard taken by Hartman on September 15, 2008, March 2, 2009, March 4, 2010, and March 17, 2010. Plaintiff's Exhibit 8.1 shows an old pumping unit gear box, tubing, a stand for a fuel tank, and a fuel tank. None of the equipment was in a condition to be put to current use and it was not necessary for the production of the adjacent well on the lease. Plaintiff's Exhibits 8.2 and 8.3 depict two trucks parked on the Bottom Yard. One of the trucks had not been moved for three years but Hartman had seen the other truck being used around the Ranch and on other Pharaoh leases. The functional truck is parked on the Bottom Yard overnight. Pump jacks, a pump jack base, tubing, and "junk pipe" shown in Plaintiff's Exhibit 8.3 were not being put to current use. With the exception of the pump jack base, the equipment could not be put to current use because of their condition.

-3-

Hartman had seen a third truck depicted in Plaintiff's Exhibit 8.4 being used on all the leases operated by Pharaoh on the Ranch. Pharaoh is using the Bottom Yard as a parking lot for these three trucks. A storage building is also found on the Bottom Yard. Several barrels are found next to the storage building and some contain unknown liquids. As was the case on the Top Yard, Hartman found evidence of leakage around some of the barrels. With the exception of the pump jack, Hartman had not seen Pharaoh put any of the equipment stored on the Bottom Yard to use in the production of the adjacent well. In Hartman's opinion, it was not reasonably necessary for an oil and gas operator to create a yard such as the Bottom Yard to operate the adjacent well.

Deborah Sport Moore is the president of Sport Environmental Services, an environmental engineering consulting firm. The firm provides various services to the oil and gas industry, including environmental liability and acquisition of site assessments, risk management, air permitting, waste water treatment plants, and remediation. Ranchero had retained Sport Environmental to evaluate the environmental issues on the Ranch including the Top and Bottom Yards. Moore had been to the Yards several times with the most recent visit just a few days before the temporary injunction hearing. She observed that the amount of equipment and materials stored on the Top and Bottom Yards had increased and she found stainage on the surface from the pipes and barrels. In her opinion, Pharaoh was not addressing the environmental issues present on the Top Yard through either prevention or management of raw materials. On the Bottom Yard, Moore found leakage around the trucks parked at that location as well as the barrels and pipes. She believed that the storage of equipment and materials had caused an environmental injury to the Ranch. Moore estimated that it would cost $100,000 or

-4-

more to clean up both the Top and Bottom Yards.

Donny McClure, a partner in Ranchero, testified that he has been in the oil and gas business for over thirty years as an operator. Ranchero purchased the Ranch with the intent of undertaking a multi-phase operation. It initially commenced wildlife and habitat management and that effort was ongoing. Ranchero was also evaluating oil field contamination of the habitat and water. Ranchero had never authorized the storage of vehicles on the Bottom Yard and it had not given Pharaoh permission to use the Top and Bottom Yards to store equipment and materials for the benefit of other leases. McClure participated in the proceedings which led to the Railroad Commission's order requiring Pharaoh to plug the wells in Sections 17 and 18. Even though the order was dated April 28, 2009, Pharaoh had only recently began plugging the wells and McClure believed that Pharaoh had only plugged six wells. In McClure's opinion, none of the equipment or materials stored at either the Top or Bottom Yard was used in or necessary to the plugging operations. Further, there was equipment and materials at the Bottom Yard which were unnecessary to operate the lone active well on Section 2 and McClure believed that the Bottom Yard was six to eight times larger than required to operate that well.

Gary Bolen, the president and CEO of Pharaoh testified that the plugging operations had begun about five weeks before the temporary injunction hearing and eight wells had been plugged. According to Bolen, Pharaoh was using the Top Yard in conjunction with the plugging operations. He denied that Pharaoh was using the Top Yard as a storage facility, but Bolen contradicted himself by testifying that Pharaoh was putting the equipment on the Top Yard with the intention of going through the equipment later to see what could be reused elsewhere on other leases. He also stated that Pharaoh might attempt to sell the equipment to a salvage company but

he had not made a final decision. Bolen did not believe he needed permission from Ranchero to store the trucks on the Bottom Yard. He admitted that he was using the equipment located at the Top Yard to service wells covered by other leases. Bolen insisted that he could use the Top and Bottom Yards because they had been there for thirty years.

William Tidwell purchased the Ranch in March of 1982. The Top and Lower Yards were in place and being used for storage when he bought the property. Tidwell continuously used both Yards for storage from March of 1982 until he sold the property. An operator benefitted from the Yards because he did not have to travel as far to get parts or supplies. Tidwell noted that some of the equipment presently located on the Yards was there when he sold the property.

At the conclusion of the hearing, the trial court granted Ranchero's application for a temporary injunction finding that: the storage of the equipment constituted an unreasonable, unnecessary, and excessive burden on the leased land, Ranchero had a probable right to the relief sought by its claims for trespass and unreasonable use of the surface; there is an immediate risk of irreparable injury in the form of erosion and environmental pollution caused by the equipment on the Ranch; storage of the equipment on the Ranch is continually denying Ranchero the enjoyment of the surface that it exclusively owns; Ranchero would be irreparably injured by Pharaoh's continuing trespass and unreasonable, unnecessary, and excessive use of the surface; and Pharaoh would continue to store the equipment on Ranchero's property unless enjoined. This appeal ensued.

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Company*, 84 S.W.3d 198, 204 (Tex. 2002). To obtain a temporary injunction, the applicant must plead and prove three specific

elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id*. The applicant is not required to establish that he will finally prevail in the litigation. *Tri-Star Petroleum Company v. Tipperary Corporation*, 101 S.W.3d 583, 587 (Tex.App.--El Paso 2003, pet. denied).

The decision to grant or deny the temporary injunction lies within the sound discretion of the trial court. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Tri-Star*, 101 S.W.3d at 587-88. We will reverse an order granting injunctive relief only if the trial court abused that discretion. *Butnaru*, 84 S.W.3d at 204. An abuse of discretion arises when the trial court misapplies the law to the established facts of the case or when it concludes that the movant has demonstrated a probable injury or a probable right to recovery and the conclusion is not reasonably supported by the evidence. *Tri-Star*, 101 S.W.3d at 587; *see State v. Southwestern Bell Telephone Company*, 526 S.W.2d 526, 528 (Tex. 1975). The reviewing court is not permitted to substitute its judgment for that of the trial court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru*, 84 S.W.3d at 204. Further, we do not review the merits of the underlying case. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). In evaluating the trial court's decision, we view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order is so arbitrary as to exceed the bounds of reasonable discretion. *Tri-Star*, 101 S.W.3d at 587; *Universal Health Services, Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex.App.--Austin 2000, no pet.).

*Mandatory Injunction or Preservation of the Status Quo?*

In the first part of its argument under Issue One, Pharaoh contends that the trial court

went beyond merely preserving the status quo by ordering it to remove all unused equipment from Sections 2 and 18 and "any other portion of the Ranch." Pharaoh reasons that this amounts to a mandatory injunction unsupported by any showing of extreme necessity or hardship. Ranchero, on the other hand, argues that the trial court's order merely restored the status quo to the "status of the Top and Bottom Yards prior to the commencement of any trespass by Pharaoh."

Well established law defines the relationship of the parties and governs their use of the surface. Under the common law, the right to minerals in place carries with it the right to enter and extract them, and all other incidents thereto as are necessary for the enjoyment of those rights. *Davis v. Devon Energy Production Company, L.P.*, 136 S.W.3d 419, 423 (Tex.App.--Amarillo 2004, no pet.), *citing Tarrant County Water Control and Improvement District Number One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993). Consequently, the holder of an oil and gas lease, in the absence of a specific contractual provision relating to surface damages, has the right to use as much of the surface as is reasonably necessary to comply with the terms of the lease and to carry out its purposes. *Brown v. Lundell*, 162 Tex. 84, 344 S.W.2d 863, 865 (1961); *Oryx Energy Company v. Shelton*, 942 S.W.2d 637, 641 (Tex.App.--Tyler 1996, no pet.); *Macha v. Crouch*, 500 S.W.2d 902, 904 (Tex.Civ.App.--Corpus Christi 1973, no writ); *see Getty Oil Company v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971)(holding that an oil and gas lease impliedly authorizes the oil and gas estate, which is the dominant estate, as much use of the surface estate as is reasonably necessary to produce and remove the minerals). Generally, an operator cannot use the surface of one lease to benefit production from another lease. *Robinson v. Robbins Petroleum Corp., Inc.*, 501 S.W.2d 865, 867 (Tex. 1973).

A person who seeks to recover from the lessee for damages to the surface has the burden of alleging and proving either specific acts of negligence or that more of the land was used by the lessee than was reasonably necessary. *Oryz Energy Co.*, 942 S.W.2d at 641, *citing Humble Oil & Refining Company v. Williams*, 420 S.W.2d 133, 134 (Tex. 1967). The burden is on the plaintiff to adduce evidence that the actions of an oil and gas operator were not reasonably necessary. *Id.*

Trespass to real property occurs when a person enters another's land without consent. *Wilen v. Falkenstein*, 191 S.W.3d 791, 797 (Tex.App.--Fort Worth 2006, pet. denied); *General Mills Restaurants, Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 833 (Tex.App.--Dallas 2000, no pet.). To recover damages for trespass to real property, a plaintiff must prove that (1) the plaintiff owns or has a lawful right to possess real property, (2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary, and (3) the defendant's trespass caused injury to the plaintiff. *Wilen*, 191 S.W.3d at 798.

With these principles in mind, we turn to the status quo analysis. The status quo is defined as the last actual, peaceable, non-contested status that preceded the pending controversy. *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004). The status quo cannot be a violation of the law. *City of Arlington v. City of Fort Worth*, 873 S.W.2d 765, 768 (Tex.App.--Fort Worth 1994, writ dism'd w.o.j.); *see The City of San Antonio v. Vakey*, 123 S.W.3d 497, 502 (Tex.App.--San Antonio 2003, no pet.)(holding that "[w]here the acts sought to be enjoined violate an express law, the status quo to be preserved could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation."). If, however, the central question in the suit is whether the status quo is a violation of the law, that determination should generally be made with a full trial on the merits. *In re Newton*, 146 S.W.3d at 652; *City of*

*Arlington*, 873 S.W.2d at 769.

Pharaoh identifies the status quo as the condition of the Top and Bottom Yards as it existed on August 20, 2008, which is the first time Ranchero sent a letter to Pharaoh complaining about its storage of equipment on the Bottom Yards. It argues that equipment has been continuously stored by oil and gas operators on the Top and Bottom Yards since 1982, and therefore, the trial court's order directing Pharaoh to remove all "unused equipment" from these sections does more than merely preserve the status quo. Ranchero asserts that the status quo is the condition of the surface prior to Pharaoh's trespass.

Beginning in March of 1992 and continuing into 2004 when Ranchero purchased the Ranch, the oil and gas operator used the Top and Bottom Yards to store equipment and supplies. After Ranchero's purchase of the Ranch, the operator likewise used the Top and Bottom Yards for storage and that use continued after Pharaoh became the operator in 2006. Thus, all of the evidence establishes that the status quo between the parties was use of the surface by the operator for storage. Ranchero argues that the status quo cannot be a violation of law but Ranchero has not identified any express law violated by Pharaoh which would justify such a significant alteration of the status quo. Furthermore, the central question in the suit below is whether Pharaoh's use of the Yards is unreasonable, and alternatively, whether its use of the surface for storage amounts to trespass. This determination should not be made in advance of the full trial on the merits. We conclude that the temporary injunction in this case is mandatory because it alters the status quo by requiring Pharaoh to remove all unused equipment from the Top and Bottom Yards. We now address whether the trial court's order can be upheld as a mandatory injunction.

There are two general types of temporary injunctions: prohibitive and mandatory. *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 400 (Tex.App.--Houston [14th Dist.] 2000, no pet.); *LeFaucheur v. Williams*, 807 S.W.2d 20, 22 (Tex.App.--Austin 1991, no pet.). A prohibitive injunction forbids conduct, whereas a mandatory injunction requires it. *Lifeguard Benefit Services, Inc. v. Direct Medical Network Solutions, Inc.*, 308 S.W.3d 102, 112 (Tex.App.--Fort Worth 2010, no pet.); *RP&R, Inc.*, 32 S.W.3d at 400. A temporary mandatory injunction changes the status quo. *RP&R, Inc.*, 32 S.W.3d at 401. Consequently, it should only be granted when necessary to prevent irreparable injury or extreme hardship. *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981); *RP&R, Inc.*, 32 S.W.3d at 401; *LeFaucheur*, 807 S.W.2d at 22. A trial court has the power to grant a temporary mandatory injunction only where the circumstances justify it. *RP&R, Inc.*, 32 S.W.3d at 400-01; *Rhodia, Inc. v. Harris County*, 470 S.W.2d 415, 419 (Tex.Civ.App.--Houston [1st Dist.] 1971, no writ). While granting a mandatory injunction is within the sound discretion of the trial court, the grant should be denied absent a clear and compelling presentation of extreme necessity or hardship. *RP&R, Inc.*, 32 S.W.3d at 401; *Rhodia*, 470 S.W.2d at 419.

An injury is irreparable if the injured party cannot be adequately compensated, or one for which the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Housing Authority of City of El Paso v. City of El Paso*, 141 S.W.3d 663, 667 (Tex.App.--El Paso 2004, no pet.). In its application for temporary injunction, Ranchero identified the harm it would suffer if Pharaoh was not ordered to remove the equipment from the Yards: (1) the equipment would serve as a habitat for snakes, insects, and rodents which Ranchero would have to contend with in the future; (2) the equipment would likely leak fluids which could damage the

-11-

surface; and (3) Pharaoh's expansion of the Top Yard would contribute to soil erosion on the Ranch.

At the injunction hearing, the environmental engineer, Deborah Moore, testified that there were rodents and snakes around the debris on the Top and Bottom Yards. Hartman testified that the snakes would pose a hazard to him personally if Pharaoh was not required to remove the equipment because the task would fall to him. Hartman admitted, on cross-examination, that he had not seen many rattlesnakes on the Ranch in 2010. Ranchero did not present any evidence regarding the cost of eradication nor did it show that the damages could not be measured by any certain pecuniary standard.

Ranchero did introduce some evidence that fluids had leaked onto the surface of the Top and Bottom Yards. The ranch foreman, Kenneth Hartman, observed rusted barrels containing unknown fluids stored on the Top Yard near a storage building. Hartman found evidence of leakage around these barrels. Likewise, Hartman found evidence of leakage from barrels containing unknown fluids on the Bottom Yard. The environmental engineer, Deborah Moore, inspected the Top and Bottom Yards and found surface staining from the stored pipes and barrels. She also found evidence of leakage around the trucks stored on the Bottom Yard. Moore testified that steps could be taken to minimize the environmental impact but Pharaoh had failed to do so. Moore believed that the storage of equipment and materials had caused an environmental injury to the Ranch and she estimated that it would cost $100,000 or more to clean up both the Top and Bottom Yards. Moore's testimony regarding the clean-up costs conclusively establishes that the damages can be measured.

Regarding the expansion of the Top Yard, Ranchero introduced evidence at the injunction

hearing that Pharaoh had used a backhoe one month before the hearing to clear away vegetation and trees in order to expand the Top Yard. It did not, however, offer any evidence that the loss of vegetation in that area would lead to soil erosion, nor did it prove the damages were not subject to measurement.

Ranchero also introduced evidence in support of another type of harm. Hartman testified that the Ranch is a recreational hunting ranch and the storage of equipment and materials was interfering with hunting operations because it was not aesthetically pleasing to the visiting hunters. He admitted, however, that no hunters had refused to return to the Ranch because of the equipment stored on the Top and Bottom Yards. This testimony does not establish that the equipment stored on the Top and Bottom Yards had caused irreparable harm or has been an extreme hardship.

Finally, we consider Ranchero's assertion that the injuries are irreparable because Pharaoh might not be able to pay any judgment taken against it. An injury is also irreparable if the defendant is insolvent. *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex.App.--San Antonio 2001, no pet.).

Ranchero did not present any evidence of Pharaoh's financial condition at the hearing. Instead, Ranchero points to the Texas Railroad Commission's order issued after the injunction hearing forfeiting Pharaoh's bond in the amount of $250,000 and requiring it to post a bond in the amount of $3.3 million dollars to be an operator in good standing. Ranchero asserts that Pharaoh has not presented any evidence that it could satisfy the bonding requirement. The burden, however, was on Ranchero to show that Pharaoh was insolvent. Ranchero also relied on evidence that Bolen had transferred some of Pharaoh's operations and interests to another

-13-

company. Bolen denied transferring the interests with the intent of avoiding Pharaoh's obligations with respect to this case. While the evidence might cause a reasonable person to inquire further into Pharaoh's financial condition, it does not establish that Pharaoh is insolvent.

In the absence of evidence establishing that the storage of equipment on the Top and Bottom Yards had caused irreparable harm or extreme hardship, the trial court abused its discretion by issuing the mandatory injunction. Issue One is sustained.

Given our resolution of this issue, it is unnecessary to address the other arguments raised by Pharaoh. We note, however, that the trial court decided ultimate issues related to the merits of the suit. In particular, the trial court determined that Ranchero has an exclusive right to the surface. The court also appeared to decide that Pharaoh's use of the surface for storage is unreasonable. These issues should not be finally resolved in a temporary injunction proceeding but should instead be reserved for the trial on the merits. *See Young v. Gardner*, 435 S.W.2d 192, 196 (Tex.Civ.App.--Houston [14th Dist.] 1968, no writ)(since the plaintiff is not required to show that he will prevail on final trial on the merits, the ultimate issues to be tried in such a final trial are not presented for final determination of the court in the hearing on the application for temporary injunction; consequently, it was error for the trial court to determine that the plaintiffs had no current right to an easement and that the construction proposed by the defendant is lawful); see also *Texas Foundries v. International Moulders & Foundry Workers' Union*, 151 Tex. 239, 248 S.W.2d 460, 464 (1952)(it is error for a trial court to grant a temporary injunction, the effect of which would be to accomplish the object of the suit, because to do so would be to determine rights without a trial); *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 882 (Tex.App.--Dallas 2003, no pet.)(stating that the legal issues before the trial court at a temporary

injunction hearing are whether the applicant showed a probability of success and irreparable injury; the underlying merits of the controversy are not presented). Although we have not addressed these issues on appeal because the injunction order is being reversed on other grounds, our opinion should not be read as approving of the trial court's decision on these matters. We reverse the injunction order and remand the cause for trial on the merits.

June 1, 2011

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., Rivera, J., and Chew, Judge
Chew, Judge (Sitting by Assignment)