**Opinion issued December 22, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00044-CV

———————————

**TANYA L. MCCABE TRUST, MCCABE FAMILY TRUST, AND THE
ROCHFORD LIVING TRUST, Appellants**

**V.**

**RANGER ENERGY LLC, Appellee**

---

**On Appeal from the 356th District Court
Hardin County, Texas[1]
Trial Court Case No. 54138**

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred the appeal to this Court. *See* Misc. Docket No. 14-9246 (Tex. Dec. 15, 2014); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases).

**O P I N I O N**

In its 2009 opinion in *Myrad Properties, Inc. v. LaSalle Bank National Ass'n*,[2] the Supreme Court of Texas held that a correction deed could not be used to substantively change an unambiguous conveyance of real property to include an additional parcel of land, as that would undermine the purpose of record notice. The Texas Legislature responded in 2011, and again in 2013, by enacting statutes to define the circumstances in which a correction deed can be used to change a recorded original instrument of conveyance to remedy nonmaterial clerical or inadvertent errors, or even to make a material correction to the deed.[3] This case requires us to apply these new statutes to a dispute about the validity of overriding royalty interests in two oil-and-gas leases.

The appellants, Tanya L. McCabe Trust, McCabe Family Trust, and Rochford Living Trust (collectively, the "Trusts"), acquired overriding royalty interests in eight oil-and-gas leases in Hardin County, Texas. The dispute is limited to two of those leases, called McShane Fee and Brice. Appellee Ranger Energy LLC later acquired some Hardin County leases at a foreclosure auction. Contending that it had

---

2    300 S.W.3d 746 (Tex. 2009).

3    *See* Act of May 13, 2011, 82nd Leg., R.S., Ch. 194, § 1, 2011 Tex. Gen. Laws 747, 748 (codified at TEX. PROP. CODE §§ 5.027–.031); *see also* Act of May 8, 2013, 83rd Leg., R.S., Ch. 158, § 3, 2013 Tex. Gen. Laws 597, 597 (codified at TEX. PROP. CODE § 5.028(a) & (a-1)).

acquired the McShane Fee and Brice leases, Ranger Energy filed suit to quiet title. The Trusts responded that the McShane Fee and Brice leases were not subject to the mortgage that was foreclosed, and therefore their overriding royalty interests had not been extinguished.

The parties filed competing motions for summary judgment that focused on the validity of purportedly "corrected" instruments that changed the original mortgage documentation which was recorded at the time the Trusts acquired their overriding royalty interests. The trial court granted summary judgment in favor of Ranger Energy, and the Trusts appealed. On appeal, the Trusts contend that the purported correction instruments, which added the McShane Fee and Brice leases to the description of the mortgaged property, were invalid as a matter of law.

We agree with the Trusts. The correction instruments were ineffective because they purported to make material changes, yet they were not correctly executed as specified by the Texas Property Code. We reverse the judgment of the trial court, and we remand this case for further proceedings.

**Background**

The dispute in this case involves two oil-and-gas leases that have been jointly owned and operated as part of a larger group of leases since at least 2004, which is the earliest information reflected in the appellate record. In March 2004, Shamrock Energy Corporation acquired leases pursuant to an assignment and bill of sale which

referred to "undivided working interests in those oil and gas leases that are described on the Exhibit 'A' that is attached hereto and made a part hereof for all purposes." The March 2004 assignment's "Exhibit 'A'" included one tract identified as the "T. Conzelman Lease," and it also included twelve leases identified by name and located in the Saratoga Oil Field in Hardin County, Texas, including leases identified as "McShane Fee" and "Brice."[4]

On June 8, 2005, Shamrock Energy conveyed to L & H Family Partnership, Ltd some but not all of its interests acquired in the March 2004 transaction. The conveyance assigned to L & H "undivided working interests in those oil and gas leases that are described on the Exhibit 'A' that is attached hereto and made a part hereof for all purposes." The June 8, 2005 assignment's "Exhibit 'A'" excluded the T. Conzelman Lease, but it included nine of the twelve leases in the Saratoga Oil

---

[4] The March 2004 assignment and bill of sale contains the word "Saratoga" on the upper-right corner of the first page of the document, but there is no reference to all or part of the leases as the "Saratoga Leases." In "Exhibit 'A'" to the March 2004 assignment, the McShane Fee and Brice leases were identified as follows:

| LEASE | NRI | WI | ACRES | RRC NO. |
|-------|-----|-----|-------|---------|
| . . . | | | | |
| McShane Fee | 1.000 | 100[%] | 4.58 | 03637 |
| . . . | | | | |
| Brice | .730 | 100[%] | .31 | 19052 |
| . . . | | | | |

4

Field that had been acquired by Shamrock Energy. Leases identified as "McShane Fee" and "Brice" were included.[5]

<hr>

[5] Like the March 2004 documents, the June 8, 2005 assignment and bill of sale contains the word "Saratoga" on the upper-right corner of the first page of the document, but there is no reference to all or part of the leases as the "Saratoga Leases." In "Exhibit 'A'" to the June 8, 2005 assignment, the McShane Fee and Brice leases were identified, with a change to the description of Brice, as follows:

| LEASE | NRI | WI | ACRES | RRC NO. |
|---|---|---|---|---|
| . . . | | | | |
| McShane Fee | 1.000 | 100[%] | 4.58 | 03637 |
| . . . | | | | |
| Brice | .780 | 100[%] | .31 | 19052 |
| . . . | | | | |

Unlike the March 2004 "Exhibit 'A'," the June 8, 2005 "Exhibit 'A'" added more descriptive identifications of eight of the nine assigned leases, including the following descriptions of the McShane Fee and Brice leases:

| | |
|---|---|
| Property Name: | McShane Fee |
| Operator: | Arrowhead Operating Inc. |
| County: | Hardin |
| State: | Texas |
| Legal: | 4.58 acres being out of the C.F.S. Jordit 320 acre Survey. |

| | |
|---|---|
| Property Name: | Brice |
| Operator: | Arrowhead Operating Inc. |
| County: | Hardin |
| State: | Texas |
| Legal: | All lands described in the following Oil, Gas and Mineral Leases and amendments thereto covering 5/16 of an acre located in the C.F.S. Jordit Survey, A-783, Hardin County, Texas. Said leases and amendments recorded as |

L & H quickly flipped the interests it acquired from Shamrock Energy, conveying them to Rex Chambers on June 29, 2005. The transaction assigned to Chambers "undivided working interests in those oil and gas leases that are described on the Exhibit 'A' that is attached hereto and made a part hereof for all purposes." The "Exhibit 'A'" attached to the June 29, 2005 assignment is substantively identical to the "Exhibit 'A'" describing the royalty interests assigned by Shamrock Energy to L & H.[6]

---

shown in Deed Records of Hardin County, Texas.

1. Oil, Gas & Mineral Lease from Brice Exploration Company to Bryan Lloyd, dated August 16, 1983, recorded in Volume 779, Page 110.
2. Amendment to Oil, Gas & Mineral Lease, from Brice Exploration Company to Bryan M. Lloyd, dated August 16, 1983, recorded in Volume 818, Page 714.
3. Oil, Gas & Mineral Lease, from Warren K. Hendriks to Bryan M. Lloyd, dated August 16, 1983, recorded in Volume 779, Page 112.
4. Amendment to Oil, Gas & Mineral Lease, from Warren K. Hendriks to Bryan M. Lloyd, dated August 10, 1985, recorded in Volume 818, Page 7.

[6] Like the March 2004 and June 8, 2005 documents, the June 29, 2005 assignment and bill of sale contains the word "Saratoga" on the upper-right corner of the first page of the document, but there is no reference to all or part of the leases as the "Saratoga Leases."

The next conveyance relevant to the McShane Fee and Brice leases was an April 2007 assignment from Chambers to Tomco II LLC. The transaction assigned to Tomco II "undivided working interests in those oil and gas leases that are described on the Exhibit 'A' that is attached hereto and made a part hereof for all purposes." The April 2007 assignment's "Exhibit 'A'" excluded approximately two-thirds of a page of language that had appeared at the beginning of the "Exhibit 'A'" descriptions attached to the June 8 and June 29, 2005 assignments. The April 2007 "Exhibit 'A'" also listed descriptions of only six of the nine leases in the Saratoga Oil Field that had been acquired by Chambers. The three excluded leases were "McShane Fee," "Brice," and "Booher."[7] Later, in December 2007, this assignment was corrected with a revised version of "Exhibit 'A'." The corrected December 2007 assignment specified that Chambers owned "an undivided fifty percent (50%) interest in those Oil, Gas and Mineral Leases, Deeds and Properties described on Exhibit 'A' attached hereto and made a part hereof for all purposes." The December 2007 corrected assignment added "McShane Fee" and "Brice" (but not "Booher") to the property listed on "Exhibit 'A'," bringing the total number of assigned leases to

---

[7] Like the preceding assignments, the April 2007 assignment and bill of sale contains the word "Saratoga" on the upper-right corner of the first page of the document, but there is no reference to all or part of the leases as the "Saratoga Leases."

eight. The descriptions for all eight leases were revised from the previous

documentation.[8]

---

[8] Unlike the preceding assignments, the December 2007 corrected assignment and bill of sale does not contain the word "Saratoga" on the upper-right corner of the first page of the document. Like the preceding documents, there is no reference to all or part of the leases as the "Saratoga Leases." In "Exhibit 'A'" to the December 2007 corrected assignment, the McShane Fee and Brice leases were identified as follows:

> **Property Name:** McShane Fee (RRC Identifier 03637)
> **Operator:** BHB Operating, Inc.
> **Description:** 4.58 acres o/o the C.F.S. Jordit Survey, A-783, Hardin County, Texas, all or a portion of which is more fully described in Deed dated March 7, 1916 from Creighton-McShane Oil Company to Paggi Brothers Oil Company, recorded in Vol. 70, Page 129 of the Deed Records of Hardin County, Texas.
>
> . . . .
>
> **Property Name:** Brice (RRC Identifier 19052)
> **Operator:** BHB Operating, Inc.
> **Description:** All lands described in the following Oil, Gas and Mineral Leases and Amendments thereto covering 5/16 of an acre located in the C.F.S. Jordit Survey, A-783, Hardin, County, Texas:
>
> 1. Oil, Gas and Mineral Lease dated August 16, 1983 from Brice Exploration Company to Bryan M. Lloyd, recorded in Vol. 779, Page 110 of the Deed Records of Hardin County, Texas, as amended by instrument dated August 19, 1985, recorded in Vol. 818, Page 714 of said Deed Records.
> 2. Oil, Gas and mineral Lease dated August 16, 1983 from Warren K. Kendricks to Bryan M. Lloyd, recorded in Vol. 779, Page 12 of the Deed Records of Hardin County, Texas,

Although the appellate record does not contain all of the underlying documents relating to the next relevant transaction, the parties to this appeal have stipulated that in August 2008 Tomco Energy, PLC and Mark III Energy Holdings, LLC executed an assignment and bill of sale, by which Tomco Energy conveyed title to "six of the eight oil and gas leases which are collectively known as the 'Saratoga Leases'." The parties have stipulated further that "[d]ue to an inadvertent error, two of the Saratoga Leases were omitted" from an "Exhibit A" attached to the August 2008 assignment, and the two omitted leases were known as the "McShane Fee Lease" and the "Brice Lease."

To finance its 2008 acquisition, Mark III borrowed $4 million from The Peoples Bank. A financing statement, security agreement, and mortgage of oil-and-gas property (the "2008 mortgage") was filed in the records of Hardin County in November 2008. Mark III granted to Peoples Bank a security interest in:

> all of Mortgagor's right, title and interest in and to the oil and gas leases and in and to the oil and gas leasehold estate and other mineral interests, if any, (all as shown of record in the offices of the County Register of Deeds as applicable) in, under and covering the following described land to wit:
>
> ### *See attached Exhibit "A"*
>
> together with all and singular the tenements, hereditaments, and appurtenances now or hereafter in anywise belonging to or appertaining

---

as amended by instrument dated August 10, 1985, recorded in Vol. 818, Page 7 of said Deed Records.

to the Mortgagor's present or future rights, title, interest or estate in and to all or any part of the mortgaged property above described . . . .

Like Tomco Energy's August 2008 assignment (as described in the parties' stipulation), the 2008 mortgage documentation identified the subject leases in an attachment which included only six leases, and which did not include the McShane Fee and Brice leases. The property description on "Exhibit 'A'" to the 2008 mortgage is substantively identical to the description contained in the (uncorrected) April 2007 assignment from Chambers to Tomco II.[9]

After obtaining the mortgage loan, Mark III sold overriding royalty interests in leases it acquired from Tomco Energy. Although Mark III had acquired only eight leases, the first such assignment, in May 2011, purported to convey to Tanya L. McCabe Trust "an undivided 10% in all oil, gas, associated hydrocarbons and minerals produced, saved and marketed from each of" nine different leases, not including McShane Fee and Brice.[10] The second assignment, in July 2011, conveyed

---

[9]   Like the (uncorrected) April 2007 assignment and bill of sale, "Exhibit 'A'" to the 2008 mortgage contains the word "Saratoga" on the upper-right corner of the first page of the document, but there is no reference to all or part of the leases as the "Saratoga Leases."

[10]  The original first assignment to the Tanya L. McCabe Trust conveyed "an overriding royalty interest in and to the oil, gas and mineral leases in Hardin County, Texas described on Exhibit 'A', attached hereto and made a part hereof for all purposes." The nine leases identified in "Exhibit 'A'" were: Sun McShane, Sun Weldon, Coline Oil Corporation, Gulf Herrington, D.G. Petty Estate, Producers Weiss, Queen City, Queen City 1 Acre, and Queen City 5

10

to Tanya L. McCabe Trust "an undivided 5% in all oil, gas, associated hydrocarbons and minerals produced, saved and marketed from each of" seven different leases, including McShane Fee and Brice.[11] The third assignment, in November 2011, conveyed to Tanya L. McCabe Trust "an undivided fifteen percent (15%) interest in all oil, gas, associated hydrocarbons and minerals produced, saved and marketed from each of" eight different leases, including McShane Fee and Brice.[12] While all three of these 2011 assignments contained different descriptions of the leases subject to the assigned overriding royalty interests, the description contained in the third

---

Acre. The assignment of overriding royalty interest does not contain the word "Saratoga" on the upper-right corner of the first page of the document, and there is no reference to all or part of the leases as the "Saratoga Leases."

[11] The original second assignment to the Tanya L. McCabe Trust conveyed "an overriding royalty interest in and to the oil, gas and mineral leases in Hardin County, Texas described on Exhibit 'A', attached hereto and made a part hereof for all purposes." The seven leases identified in "Exhibit 'A'" were: Sun Weldon, Coline Oil Corporation, Gulf Herrington, D.G. Petty Estate, Producers Weiss, McShane Fee, and Brice. The assignment of overriding royalty interest does not contain the word "Saratoga" on the upper-right corner of the first page of the document, and there is no reference to all or part of the leases as the "Saratoga Leases."

[12] The original third assignment to the Tanya L. McCabe Trust conveyed "an overriding royalty interest in and to the oil, gas and mineral leases in Hardin County, Texas described on Exhibit 'A', attached hereto and made a part hereof for all purposes." The eight leases identified in "Exhibit 'A'" were: Gulf-Herrington, McShane Fee, D.G. Petty Estate, Producers Weiss, Sun McShane, Coline Oil Corporation, Sun Weldon, and Brice. The assignment of overriding royalty interest does not contain the word "Saratoga" on the upper-right corner of the first page of the document, and there is no reference to all or part of the leases as the "Saratoga Leases."

11

assignment was substantively identical to the property description attached to the 2007 corrected assignment from Chambers to Tomco II. Each of these assignments was filed in the records of Hardin County.

The third assignment apparently reflected what the parties intended with respect to all three 2011 assignments, because Mark III and Tanya L. McCabe Trust corrected the first two assignments to include the same property description as the third assignment (thereby mirroring the property description in the 2007 corrected assignment from Chambers to Tomco II). The corrected versions of the first and second assignments to the Tanya L. McCabe Trust were executed by the parties in November 2011 and filed in the records of Hardin County in December 2011.

Although the actual documentation is not included in the appellate record, the parties stipulated that in December 2011, Tomco Energy executed a corrected assignment and bill of sale which added McShane Fee and Brice to the property description accompanying its 2008 assignment to Mark III. With this correction, the assignment from Tomco Energy to Mark III was brought into conformity with the property descriptions attached to the 2007 corrected assignment from Chambers to Tomco II and with the three 2011 assignments to Tanya L. McCabe Trust (as corrected in November 2011). The parties to this appeal do not dispute the validity of this correction instrument.

12

In April 2012, Mark III made two additional assignments, each of an undivided 2.5% overriding royalty interest: one to McCabe Family Trust and the other to Rochford Living Trust. Like the 2011 assignments to Tanya L. McCabe Trust (as corrected), these assignments referenced a property description that was substantively identical to that attached to the 2007 corrected assignment from Chambers to Tomco II, including the McShane Fee and Brice leases. These assignments were filed in the Hardin County records.

Mark III fell behind in its loan payments, and Peoples Bank filed a foreclosure suit and a suit to quiet title. In December 2012, to resolve their disputes and in lieu of foreclosure, Mark III paid the bank $750,000 and executed a renewed and modified deed of trust, security agreement, and assignment of production (the "2012 deed of trust"). The 2012 deed of trust identified, as part of the "Mortgaged Property" subject to that agreement, Mark III's interests in leases "in, on or under and covering the real property described in Exhibit A and made a part hereof for all purposes." The "Exhibit 'A'" attached to the 2012 deed of trust was substantively identical to the "Exhibit 'A'" that described the property subject to the bank's security interest under the original 2008 mortgage—it listed six leases, and the

McShane Fee and Brice leases were not referenced.[13] The 2012 deed of trust specifically provided that it would not "merge with the security interest" that the bank held in the collateral that was subject to the liens. This was done for purposes of priority as between "intervening or inferior liens and encumbrances, if any, on or against the collateral," and the bank retained the right to exercise its remedy of foreclosure.

Soon after Peoples Bank recorded the 2012 deed of trust, it realized that the McShane Fee and Brice leases had been omitted, and the bank recorded a revised version (the "2013 revised deed of trust"). That document added the word "Corrected" to the front page, it added an explanation of the changes to the front page,[14] and it added descriptions of the McShane Fee and Brice leases to the end of "Exhibit A."[15] In addition, Peoples Bank also filed a revised version of its mortgage

---

[13] Similar the original 2008 mortgage, "Exhibit 'A'" to the 2012 deed of trust contains the word "Saratoga" near the top of the document, but there is no reference to all or part of the leases as the "Saratoga Leases."

[14] The explanation stated: "This document was originally filed under County Clerk Instrument No. 2012-33676, Official Public Records of Hardin County, Texas and is being refiled to correct the Exhibit A attached at the time of the original filing."

[15] Unlike any of the previously described documents, "Exhibit A" to the 2013 revised deed of trust references the described property as "Saratoga Leases." The McShane Fee and Brice leases were identified similarly to the recorded December 2007 corrected assignment from Chambers to Tomco II (with the identification of the operator removed), as follows:

| | |
|---|---|
| Property Name: | McShane Fee |
| County: | Hardin |
| State: | Texas |
| Legal: | 4.58 acres being out of the C.F.S. Jordit 320 acre Survey. |
| | |
| Property Name: | Brice |
| County: | Hardin |
| State: | Texas |
| Legal: | All lands described in the following Oil, Gas and Mineral Leases and amendments thereto covering 5/16 of an acre located in the C.F.S. Jordit Survey, A-783, Hardin County, Texas. Said leases and amendments recorded as shown in Deed Records of Hardin County, Texas. |

1. Oil, Gas & Mineral Lease from Brice Exploration Company to Bryan Lloyd, dated August 16, 1983, recorded in Volume 779, Page 110.
2. Amendment to Oil, Gas & Mineral Lease, from Brice Exploration Company to Bryan M. Lloyd, dated August 16, 1983, recorded in Volume 818, Page 714.
3. Oil, Gas & Mineral Lease, from Warren K. Hendriks to Bryan M. Lloyd, dated August 16, 1983, recorded in Volume 779, Page 112.
4. Amendment to Oil, Gas & Mineral Lease, from Warren K. Hendriks to Bryan M. Lloyd, dated August 10, 1985, recorded in Volume 818, Page 7.

documentation (the "2013 revised mortgage"), which changed the exhibit to the original 2008 mortgage by substituting the same "Exhibit A" document that was attached to the 2013 revised deed of trust.

Neither Peoples Bank nor Mark III signed the 2013 revised deed of trust or the 2013 revised mortgage. Instead the bank used copies of the signature pages from the 2012 deed of trust and the 2008 mortgage, which had been recorded previously, and it notified Mark III of the filing of the new versions of the documents.

Two months later, in March 2013, Peoples Bank and Mark III entered into a second written settlement agreement, which asserted that the bank had the right to foreclose on the lien against the "Saratoga Leases," which were defined in that agreement to embrace the property listed on an "Exhibit A" substantively identical to the one attached to the 2013 revised deed of trust and the 2013 revised mortgage. Peoples Bank also agreed to pay a third-party lienholder $150,000 to obtain release of its lien against the McShane Fee and Brice leases.

On the same date, Peoples Bank transferred its rights to an affiliate, Ranger Energy, which foreclosed the mortgage. In May 2013, Ranger Energy filed a declaratory judgment action against the Trusts. It asserted that because of the foreclosure sale, the Trusts' overriding royalty interests in the McShane Fee and Brice leases had been extinguished.

The Trusts disagreed and sought partial summary judgment on the grounds that the revised 2013 mortgage and deed of trust documents did not affect their interests in the McShane Fee and Brice leases, which were not listed in or encumbered by the original 2008 mortgage. Ranger Energy filed a competing motion for summary judgment, which argued that the foreclosure sale extinguished the Trusts' interests in the McShane Fee and Brice leases. The trial court denied the Trusts' motion for partial summary judgment, granted summary judgment in favor of Ranger, and issued a final declaratory judgment that the Trusts' overriding royalty interests were void and extinguished. The Trusts appealed.

**Analysis**

This appeal from rulings on cross-motions for summary judgment involves the application of the correction-instrument statutes in the Texas Property Code. Ranger Energy argues that the 2013 revisions to the 2008 mortgage and 2012 deed of trust were valid and that the foreclosure extinguished the Trusts' interests. As a result, it contends that it obtained title to the McShane Fee and Brice leases at the foreclosure auction.[16]

---

[16] Although Ranger Energy suggests that we lack jurisdiction over the interlocutory denial of the Trusts' summary-judgment motion, in this case the trial court's rulings on cross-motions for summary judgment resulted in an appealable final judgment. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007).

The Trusts contend that the revised documents prepared by Peoples Bank in 2013 did not comply with the correction-instrument statutes as a matter of law, and therefore they did not validly correct the 2008 mortgage. They contend that the foreclosure sale pertained only to the leases actually included in the 2008 mortgage, but not the McShane Fee and Brice leases, which were omitted. Thus, the Trusts argue that the foreclosure sale had no effect on their overriding royalty interests in those leases.

On appeal, the Trusts argue in two issues that the trial court erred by granting summary judgment for Ranger Energy and by denying their motion for summary judgment. We review de novo the trial court's ruling on a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When both sides move for summary judgment, and the trial court grants one motion and denies the other, a reviewing court considers both sides' summary-judgment evidence, determines all questions presented, and renders the judgment the trial court should have rendered. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). Each party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). When a plaintiff moves for summary judgment on

18

its own claim, it must prove conclusively all essential elements of its cause of action. *See Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). A defendant moving for summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

We review issues involving statutory interpretation de novo. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). Our primary objective is to give effect to the intent of the Legislature, as it has been expressed by the plain meaning of the text, "unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results." *Id.* "When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008).

The correction-instrument statutes were added to the Property Code in 2011 in response to the Supreme Court's decision in *Myrad Properties, Inc. v. LaSalle Bank National Ass'n*, 300 S.W.3d 746 (Tex. 2009), which had addressed the scope of correction instruments in the real-estate context. The Supreme Court observed that "using a correction deed to convey an additional, separate parcel of land is

beyond the appropriate scope of a correction deed." *Myrad Props.*, 300 S.W.3d at 750. It further noted that "[p]reserving the narrow circumstances for acceptable use of a correction deed is important because a proper correction deed may relate back to the date of the deed it corrects." *Id*. "To allow correction deeds to convey additional, separate properties not described in the original deed would introduce unwarranted and unnecessary confusion, distrust, and expense into the Texas real property records system." *Id.* The Court held that a correction deed could not be used to convey two parcels of land at a nonjudicial foreclosure sale after the original deed unambiguously had conveyed only one of the mortgaged parcels. *Id.* at 751. The Court explained that allowing substantive changes through correction deeds would undermine the purpose of record notice. *Id*. at 750–51.

Soon after the *Myrad Properties* decision, the Legislature codified the circumstances under which a correction deed can be used to make both material and nonmaterial corrections. This legislation effectively modified the *Myrad Properties* rule by expressly allowing "material" changes to be made by a correction instrument. *See* Act of May 13, 2011, 82nd Leg., R.S., Ch. 194, § 1, 2011 Tex. Gen. Laws 747, 748 (codified at TEX. PROP. CODE §§ 5.027–.031).

Title 5, Subchapter B of the Property Code now authorizes the correction of recorded instruments that transfer real property or an interest in real property. *See* TEX. PROP. CODE § 5.027(a). "A correction instrument replaces and is a substitute

20

for the original instrument." *Id.* § 5.030(b). It is "(1) effective as of the effective date of the recorded original instrument of conveyance; (2) prima facie evidence of the facts stated in the correction instrument; (3) presumed to be true; (4) subject to rebuttal; and (5) notice to a subsequent buyer of the facts stated in the correction instrument." *Id.* § 5.030(a). The Property Code permits "a nonmaterial change that results from a clerical error," *id.* § 5.028(a), "a nonmaterial change that results from an inadvertent error," *id.* § 5.028(a-1),[17] and "a material correction" to a recorded instrument of conveyance. *Id.* § 5.029.

The statute allows correction of *nonmaterial clerical errors* that may be corrected "by a person who has personal knowledge of facts relevant to the correction," including:

(1)  a correction of an inaccurate or incorrect element in a legal description, such as a distance, angle, direction, bearing or chord, a reference to a plat or other plat information, a lot or block number, a unit, building designation, or section number, an appurtenant easement, a township name or number, a municipality, county, or state name, a range number or meridian,

---

[17]  We include Section 5.028(a-1) for sake of completeness, and because the dissent places the entire weight of its analysis on this particular provision. We note, however, that it is actually inapplicable to the case before us. The statute was enacted in 2013, after all the relevant events giving rise to this dispute. The Legislature expressly made the statute effective September 1, 2013, so there is no plausible argument that the statute operates retrospectively to save the 2013 revised deed of trust and mortgage. *See* Act of May 8, 2013, 83rd Leg., R.S., ch. 158, 2013 Tex. Gen. Laws 598 ("This Act takes effect September 1, 2013.").

21

a certified survey map number, or a subdivision or condominium name; or

(2) an addition, correction, or clarification of:

(A) a party's name, including the spelling of a name, a first or middle name or initial, a suffix, an alternate name by which a party is known, or a description of an entity as a corporation, company, or other type of organization;

(B) a party's marital status;

(C) the date on which the conveyance was executed;

(D) the recording data for an instrument referenced in the correction instrument; or

(E) a fact relating to the acknowledgment or authentication.

*Id.* § 5.028(a). Examples of *nonmaterial inadvertent errors* that may be corrected include:

(1) a legal description prepared in connection with the preparation of the original instrument but inadvertently omitted from the original instrument; or

(2) an omitted call in a metes and bounds legal description in the original instrument that completes the description of the property.

*Id.* § 5.028(a-1).

The code likewise authorizes *material corrections* that may be made by "the parties to the original transaction or the parties' heirs, successors, or assigns," including a correction to:

(1) add:

22

(A)    a buyer's disclaimer of an interest in the real property that is the subject of the original instrument of conveyance;

(B)    a mortgagee's consent or subordination to a recorded document executed by the mortgagee or an heir, successor, or assign of the mortgagee; or

(C)    land to a conveyance that correctly conveys other land;

(2)    remove land from a conveyance that correctly conveys other land; or

(3)    accurately identify a lot or unit number or letter of property owned by the grantor that was inaccurately identified as another lot or unit number or letter of property owned by the grantor in the recorded original instrument of conveyance.

*Id.* § 5.029(a).

## I.    Materiality of changes

The Trusts contend that the revised mortgage documentation contained material corrections that did not comply with Section 5.029 because it was not executed by the proper parties. At trial as on appeal, Ranger Energy's response has been that the revised documents were nonmaterial corrections of the legal description. Ranger Energy argued that an agreed stipulation of facts between it and the Trusts conclusively established that the purpose was to correct an inadvertent error. Thus, it reasoned that the corrections were nonmaterial. The distinction is important because the Property Code imposes different procedural requirements for material and nonmaterial corrections.

To determine whether this case involves material or nonmaterial corrections, we compare the changes made by the 2013 revised mortgage and deed of trust to Sections 5.028 and 5.029. Both the 2013 revised mortgage and deed of trust had the primary effect of adding the McShane Fee and Brice leases to the exhibits that listed the properties as security for the loan or as subject to the deed of trust. The original exhibits recorded in 2008 and 2012 listed each individual lease by name, the name of the oil-and-gas operator, the county and state in which the lease was located, and a "legal description," which described each lease by reference to a prior conveyance or survey, and including in some cases the volume and page number of prior recordation. The 2013 revised versions added the McShane Fee and Brice leases to the lists, including their names, county and state of location, and legal descriptions similar to the others. Thus, the revisions purported to add property interests in two leases that previously were not listed.

The addition of land to a conveyance that correctly conveys other land is a material change. *See id.* § 5.029(a)(1)(C); *cf. Myrad Props.*, 300 S.W.3d at 750. In this case, the bank's correction instruments purported to add the McShane Fee and Brice leases to a mortgage and deed of trust that correctly conveyed an interest in

other specifically identified leases.[18] Pursuant to Section 5.029, such a change indicates a material correction.

---

[18]   Our dissenting colleague takes issue with this conclusion, stating that she would conclude instead that "the revisions in the correction instruments added the McShane Fee and Brice Leases to the *legal description* of the Saratoga Leases, the property interest conveyed by Tomco to Mark III in 2008 and mortgaged by Mark III to Peoples Bank in 2008." Dissent at 21. That statement significantly distorts the operative facts. The bank's correction instruments at issue in this appeal did not correct the 2008 conveyance from Tomco Energy to Mark III, they purported to correct the 2008 mortgage and the 2012 deed of trust. The 2008 mortgage and the 2012 deed of trust did not define the mortgaged property by reference to "a property interest conveyed by Tomco to Mark III," nor was the security interest identified as property known as the "Saratoga Leases." To the contrary, both the 2008 mortgage and the 2012 deed of trust defined the subject real property by reference to an attached "Exhibit A." Exhibit A to the recorded 2008 mortgage and 2012 deed of trust defined the mortgaged property by providing the legal description of six specifically identified oil-and-gas leases. As such, a purported correction instrument substituting the previous Exhibit A with a new document adding two additional leases is a material correction, particularly with respect to the interests of any entity which, like the Trusts, may have acquired an interest in the added leases without any actual or constructive notice that bank later would claim they also were subject to the mortgage. *Cf*. TEX. PROP. CODE § 5.029(a)(1)(C); *Myrad Props.*, 300 S.W.3d at 750. To the extent our dissenting colleague also suggests that the 2008 mortgage and the 2012 deed of trust merely "*listed*" the leases, and they were not actually "*conveyed*," Dissent at 20, the only possible implication is that, contrary to the parties' shared assumption, the 2008 mortgage and the 2012 deed of trust do not qualify as "original instrument[s] of conveyance" subject to the correction-instrument provisions of the Property Code. We need not resolve that issue which has not been raised by the parties, other than to observe that if Sections 5.028 and 5.029 do not apply to these correction instruments, then logic of the *Myrad Properties* rule dictates that they were ineffective.

Further, a comparison of Section 5.028 to the changes made in the 2013 revised documentation shows that none of the corrections are of the types identified as nonmaterial. For example, the correction instruments at issue did not change any of the identifying information or descriptions that were in the original documents (other than to delete the identification of the lease operators). They did not alter any element in any of the existing legal descriptions, *see* TEX. PROP. CODE § 5.028(a)(1), nor did they add, correct, or clarify a party's name or marital status, the date of execution of the conveyance, recording data for an instrument referenced in the correction instrument, or a fact relating to acknowledgment or authentication. *See id.* § 5.028(a)(2). Thus, the correction instruments at issue are not consistent with a nonmaterial correction pursuant to Section 5.028(a).[19]

The corrections at issue added two leases to a conveyance that correctly conveyed interests in other specifically identified leases. The addition of "land to a conveyance that correctly conveys other land" is a material change. *Id.* § 5.029(a)(1)(C). Having compared the plain and unambiguous language of the

_____

[19] Ranger Energy additionally argued that because the omission of these leases was inadvertent, the corrections were nonmaterial pursuant to Section 5.028(a-1). That provision did not take effect until September 1, 2013, after this litigation already had commenced. *See* Act of May 8, 2013, 83rd Leg., R.S., ch. 158, 2013 Tex. Gen. Laws 598 ("This Act takes effect September 1, 2013.").

statute with the attempted correction instruments in this case, we conclude that the addition of two leases was a material change.

## II.    Retrospective validity of correction instruments

The requirements for a correction instrument differ for nonmaterial and material changes. *See id.* §§ 5.028–.029. An instrument making a material change must be "executed by each party to the recorded original instrument of conveyance the correction instrument is executed to correct or, if applicable, a party's heirs, successors, or assigns." *Id.* § 5.029(b)(1). An instrument making a nonmaterial correction need not be so "executed," but it must be prepared by someone with personal knowledge of the facts relevant to the correction, and the instrument itself must disclose the basis for such personal knowledge. *Id.* § 5.028(a), (c).[20] Both

---

[20]    Having incorrectly concluded that the expansion of the definition of the mortgaged property from six to eight leases was a nonmaterial correction, our dissenting colleague makes the conclusory assertion that the evidence "shows that all of the requirements of Section 5.028 were met." Dissent at 21. Yet the dissent makes no effort to explain how the correction instrument satisfied the requirement that a "person who executes a correction instrument" under Section 5.028 "shall disclose in the instrument the basis for the person's personal knowledge of the facts relevant to the correction of the recorded original instrument of conveyance." TEX. PROP. CODE § 5.028(c). In fact, the correction instrument contains no such disclosure, nor was it "executed" by a person. Instead, the bank simply altered the first page to provide notice of the correction, it substituted a new version of "Exhibit 'A'," and it recorded the new document. Accordingly, even if the dissent were correct about the applicability of Section 5.028(a-1) to an "inadvertent error" on these facts, the instrument still was not correctly executed as specified by the Property Code.

nonmaterial and material correction instruments must be recorded in each county in which the original instrument was recorded. *Id.* §§ 5.028–.029.

It is undisputed that the correction instruments were not executed by Peoples Bank or Mark III—the parties to the original instruments—or by any of their successors in interest. As such, the correction instruments did not comply with the statute. *See id.* § 5.029. The correction instruments thus did not replace or substitute for the original mortgage or deed of trust. *See id.* § 5.030(b). They were not retrospectively valid as of the effective date of the recorded original instrument. *See id.* § 5.030(a). They could not be construed as notice to a subsequent buyer of the facts stated therein. *See id.*

## III.   Ratification

Ranger Energy also contends that Mark III ratified the correction instruments by signing the second settlement agreement, which stated that Peoples Bank had the right to foreclose on all "Saratoga Leases," as that term was defined in the agreement. We understand Ranger Energy's argument to be that Mark III's ratification of the correction instrument caused it to have retrospective effect as of the original conveyance date.

The Property Code does not include any provision for any party's unilateral ratification of an invalid correction instrument used to make a material correction to a prior recorded instrument of conveyance. *See id.* § 5.029. Instead it includes a

28

mandatory requirement that the correction instrument itself be "executed" by "each party to the recorded original instrument of conveyance" (or their successors in interest) in order to be effective. *See id.* §§ 5.029–.030. Even if we were to agree with Ranger Energy that "substantial compliance" is all that is required to satisfy the correction statute,[21] we still could not conclude that standard was met in this case. To the extent "substantial compliance with a statute means compliance with its essential requirements," *Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 403 (Tex. 2009), we have no basis upon which to conclude that the requirement of execution "by each party to the recorded original instrument" is not "essential" to fulfilling the Legislature's standard for permitting a material correction as a modification of the *Myrad Properties* rule that allowing substantive changes through correction deeds would undermine the purpose of record notice. *Cf. Myrad Props.*, 300 S.W.3d at 750–51.

The primary issue is the effect of these purported correction instruments on the overriding royalty interests that previously had been assigned to the Trusts and recorded in Hardin County. "The general rule is that in a contest over rights or

---

[21] The statute provides that "substantial compliance" is sufficient to effectuate a correction instrument made prior to the statute's effective date of September 1, 2011. *See* TEX. PROP. CODE § 5.031. The statute is silent as to whether substantial compliance is adequate for instruments filed after the effective date, when parties to an attempted correction would be on notice of the statutory requirements.

interests in property, the party that is first in time is first in right." *Nat'l City Bank v. Tex. Capital Bank, N.A.*, 353 S.W.3d 581, 585 (Tex. App.—Dallas 2011, no pet.); *accord World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 668 (Tex. App.—Fort Worth 1998, pet. denied). Even to the extent Mark III ratified the attempted correction instruments, that action did not cause the documents to relate back to the original mortgage which predated the assignments to the Trusts, at least for purposes of determining the validity of those assignments. *Cf.* TEX. PROP. CODE § 5.029.

Because the 2013 revised deed of trust and mortgage did not satisfy the correction statute, at the time of the foreclosure sale the only recorded security interest enforceable against the Trusts was the mortgage executed and recorded in 2008, which did not include the McShane Fee and Brice leases. A trustee's power to sell property must be exercised in strict compliance with the deed of trust, and a "foreclosure sale purchaser obtains only that title which the trustee has authority to convey." *Conversion Props., L.L.C. v. Kessler*, 994 S.W.2d 810, 813 (Tex. App.—Dallas 1999, pet. denied). Therefore, Ranger Energy did not obtain any interest in the McShane Fee and Brice leases. *See id.*

## IV. Bona fide purchaser status

In its motion for summary judgment, Ranger Energy argued that the 2013 revised instruments substituted for the original 2008 mortgage and 2012 deed of trust and that the Trusts could overcome the effect of this substitution only by showing

that they were bona fide purchasers with regard to their interests in the McShane Fee and Brice leases. Ranger Energy reiterates this argument on appeal, asserting under Section 5.030 that the correction instruments have no impact on the Trusts unless they "are bona fide purchasers with regard to their interests in the McShane Fee and Brice Leases." Ranger Energy's argument asserts the Trusts do not qualify as bona fide purchasers because they had notice of the mortgage of other leases in Hardin County and had a duty to inquire of the bank as to whether it claimed an interest in the McShane Fee and Brice leases.

Section 5.030 states in relevant part:

(b)     A correction instrument replaces and is a substitute for the original instrument. Except as provided by Subsection (c), a bona fide purchaser of property that is subject to a correction instrument may rely on the instrument against any person making an adverse or inconsistent claim.

(c)     A correction instrument is subject to the property interest of a creditor or a subsequent purchaser for valuable consideration without notice acquired on or after the date the original instrument was acknowledged, sworn to, or proved and filed for record as required by law and before the correction instrument has been acknowledged, sworn to, or proved and filed for record as required by law.

TEX. PROP. CODE § 5.030(b), (c).

These provisions apply only when there is a valid correction instrument. *See id.* As we have concluded that the correction instruments in this case were invalid and did not affect the Trusts' interests in the McShane Fee and Brice Leases, we

31

need not determine whether the Trusts were "bona fide purchasers" or whether their interests were affected by Section 5.030.[22]

## Conclusion

The 2013 revised mortgage documentation did not satisfy statutory requirements to constitute material corrections. The McShane Fee and Brice leases were not subject to the mortgage that was foreclosed by Peoples Bank. As such, the foreclosure had no effect on the Trusts' overriding royalty interests in the McShane Fee and Brice leases. Ratification by Mark III and the bank did not divest the Trusts of their overriding royalty interests in the McShane Fee and Brice leases. We therefore hold that the trial court should have granted the Trusts' partial summary-judgment motion and denied Ranger Energy's summary-judgment motion. Accordingly, we sustain both issues raised by the Trusts.

We reverse the judgment of the trial court, we render partial summary judgment in favor of the Trusts, and we remand this case to the trial court for further

---

[22] *See* TEX. R. APP. P. 47.1. Although the issue is immaterial to our analysis, we note there is no factual basis in the record for the dissent's conclusory assertion that when the Trusts acquired their interests in the McShane Fee and Brice leases in 2011 and 2012, they had knowledge that those leases were subject to the 2008 mortgage and 2012 deed of trust, even before the recording of the 2013 revised deed of trust and the 2013 revised mortgage. *See* Dissent at 24.

proceedings consistent with this opinion, including consideration of attorney's fees as requested by the Trusts' motion for partial summary judgment.

Michael Massengale
Justice

Panel consists of Justices Keyes, Massengale, and Lloyd.

Justice Keyes, dissenting.