

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
| KENNETH R. LYLE and LINDA L. MORRISON, Individually and as Trustee of the RUTH MARY LOCKE BARD TRUST, | § | No. 08-19-00216-CV |
| | § | |
| Appellants, | § | Appeal from the |
| | § | 83rd Judicial District Court |
| v. | § | of Pecos County, Texas |
| MIDWAY SOLAR, LLC, GARY D. DRGAC, ET AL., | § | (TC# P-7991-83-CV) |
| | § | |
| Appellees. | § | |

**O P I N I O N**

Texas is a leader in energy. Undeniably, Texas produces the nation's largest share of oil and gas.[1] At the same time, its public policy favors adding renewable energy sources into the State's energy portfolio.[2] The central issue in this case raises the potential conflict between the

---

[1] Texas produces more than three times the amount of oil as the nearest competitor, North Dakota. STATISTA, https://www.statista.com/statistics/714376/crude-oil-production-by-us-state/ (last visited December 28, 2020). Texas also leads the nation in natural gas production. U.S. ENERGY INFORMATION ADMINISTRATION, https://www.eia.gov/energyexplained/natural-gas/where-our-natural-gas-comes-from.php (last visited December 28, 2020).

[2] In 1999, the Legislature created ambitious goals for renewable energy in Texas. *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 61 (Tex. 2014) referring to TEX.UTIL.CODE § 39.904, labeled as "Goal for Renewable Energy."

1

operation of a large-scale solar facility and the owners of the mineral interests on the land where the solar array sits. The mineral owners claim the solar panels and associated transmission lines impair their ability to drill for any oil and gas which might lie beneath the surface. Accordingly, they seek damages from the surface owner and solar facility owner for that lost opportunity. The rub, however, is that the mineral owners are not actively attempting to develop those minerals. And the solar facility and surface owner assert that if the mineral owners ever do seek to extract oil or gas, they can accommodate that development. They successfully argued below that under the "accommodation doctrine" the mineral owners claim for damages should be dismissed until they actively seek to develop their minerals.

For the reasons set forth below, we conclude that the accommodation doctrine could apply to this dispute, but under the current state of the evidence, its application, and indeed the causes of action asserted, are all premature until the mineral owners actually seek to develop their minerals. We affirm that part of the summary judgment, but reform it to be without prejudice. The parties also contest whether certain waiver agreements signed by mineral owners on adjacent tracts slandered the title of the Appellants in this case. As to that dispute, we affirm in part and reverse in part the summary judgment.

## I. FACTUAL BACKGROUND

### A. The 1948 Deed and the Current Ownership of Section 14

Appellants Kenneth R. Lyle and Linda L. Morrison, Individually and as Trustee of the Ruth Mary Locke Bard Trust (collectively "the Lyles") own a portion of an undeveloped mineral estate located on a 315-acre tract of land in Pecos County ("Section 14"). The Lyles derived their mineral ownership from a 1948 Deed, in which the owners of that tract transferred surface ownership to a third party, while reserving to themselves the mineral interests. The Lyles own an

2

undivided 27.5% of the mineral rights in Section 14. Appellee Gary D. Drgac owns 100% of the surface rights in the tract and has no interest in the mineral estate.

It is undisputed that the Lyles have never leased out their interests to any oil and gas operators and have no current plans to lease their estate or to otherwise develop their mineral interests at this time. They have commissioned no geological studies, nor entered into any drilling contracts for the minerals. Since January 1, 2015, the Lyles had not received a single request to lease or purchase the mineral estate in Section 14. And the Lyles conceded they had no plans for drilling any wells.

## B. The Midway Leases

In October 2015, Drgac entered into a lease with Appellee Midway Solar, LLC allowing it to build a solar energy facility on the south half of Section 14, as well as on certain portions of adjoining land in sections 71, 77, and 79, in which he also held an ownership interest. His brother, Larry Drgac, who had an interest in a portion of the land in question, entered into his own separate lease with Midway (collectively the "Leases"). With options to renew, Midway has the right "to free and unobstructed use and development of solar energy resources" for up to 55 years. In addition to allowing Midway to place solar panels, the Leases also gave Midway the right to place transmission lines, electrical lines, and cable lines anywhere on the property, subject to the Drgac's consent.

The Leases, however, expressly recognized that Drgac did not own the mineral interests on the subject property, and that the owners of the mineral interests on the property constituted a title encumbrance. In addition, Midway acknowledged in the Leases that Drgac had no "right to

3

control" the mineral owners' activities. And finally, Drgac agreed to cooperate with Midway "in obtaining surface waivers . . . from each owner of a mineral interest."[3]

Drgac and Midway soon amended the Leases to identify "Designated Drill Site Tracts" on the leased property for the benefit of any "present or future operator" exploring for oil and gas on the property. In particular, the amendment designated an 80-acre tract at the north end of Section 14 and a 17-acre strip at the south end as drill sites that were exempt from solar construction. The Lyles had no input into the location of these drilling sites and there is no evidence in the record regarding how Drgac and Midway decided where to place the sites. Both leases were recorded in the Pecos County public records by agreement of the parties.

### C. The Construction of the Solar Facility

Midway ultimately covered 215 acres on the south half of Section 14 with solar panels and transmission lines, which constituted approximately 70% of the surface land above the Lyles's mineral estate. Midway left open the two reserved drilling sites described above. The following photo illustrates the placement of the solar panels sandwiched by the open reserved drilling site tracts:

---

[3] Texas has long held that a mineral estate carries with it the right to enter the surface to extract the minerals. *Cowan v. Hardeman,* 26 Tex. 217, 222 (1862). Given the potential conflict between a surface owner who leases land to a solar operator and the mineral estate owner who has a right to use the surface to explore and develop minerals, one solution is to obtain a waiver from the mineral estate owner's competing rights to the surface. *See* Ernest E. Smith, et al., *Everything Under the Sun: A Guide to Siting Solar in the Lone Star State*, *in* 12 TEX. J. OIL GAS & ENERGY L. 41, 60-61 (2017).

4



The entire solar facility is completely fenced with no public access.

### D. The Surface Waiver Agreements

At various times in 2016, Midway obtained waiver agreements from twenty individuals who owned mineral interests on the *adjoining* property in Sections 71 and 77. The waivers purport to relinquish all or a portion of the individuals' rights to use the surface of the leased premises for mineral exploration, giving Midway unfettered access and use of the surface. As we explain in more detail below, at least some of the waiver agreements expressly state that the individuals have mineral rights in Section 14, and some suggest that through reference to several attachments. None of the twenty individuals who signed the waivers, however, had any interest in Section 14. The agreements were all recorded in the public records of Pecos County.

At some point in 2018, the Lyles complained to Midway that the surface waivers were invalid insofar as they applied to Section 14. Midway initially responded by making certain corrections to thirteen of the waivers, leaving seven of them unaltered. Midway then re-recorded

5

the altered agreements, but did not obtain the signature of any of the mineral owners before doing so.

In addition, after suit was filed, Midway filed a "Disclaimer of Interest," in which it attached the twenty surface waiver agreements. The disclaimer states that the waiver agreements do not "grant, convey or transfer to Midway any right, title or interest to the mineral estate of Section 14." The disclaimer further stated that, "[a]ny suggestion or implication that the [waivers] convey the right to develop the mineral estate of Section 14 is hereby emphatically disclaimed by Midway," and that it was never "the intent of Midway to claim" any such right.

## II. PROCEDURAL BACKGROUND

### A. The Lyles' Lawsuit

After the solar facility was constructed, the Lyles filed a lawsuit against Midway, Drgac, and the twenty individuals who signed the surface waivers alleging that: (1) they were entitled to a declaration quieting title in their mineral estate because the surface waiver agreements created a cloud on their title; (2) Drgac and Midway had breached the terms of the 1948 Deed by denying them reasonable access to their minerals by covering 70% of the surface with solar panels and transmission lines; and (3) Drgac and Midway, with the participation of the surface waiver defendants, were trespassing on the Lyles' mineral estate by their above-described actions. The Lyles sought damages for the alleged trespass and breach of contract, contending that the construction of the solar facility had "destroyed and/or greatly diminished the value" of their mineral estate. The Lyles requested a "mandatory permanent injunction" to remove the solar panels and transmission lines that were allegedly encroaching on and covering their mineral interest and easement rights.

6

During the pendency of this litigation, the Lyles resolved their dispute with thirteen of the surface waiver defendants.[4]

## B. The Motions for Partial Summary Judgment

The parties filed a series of partial motions for summary judgment which ultimately disposed of all the Lyles's claims.

### 1. The quiet title motions

In their first motion for partial summary judgment, Midway and Drgac argued that the surface waiver agreements did not create a cloud on the Lyles' title, and that even if they did, any cloud had been removed by the filing in the public record of Midway's Disclaimer of Interest, together with the thirteen altered surface waiver agreements. None of the surface waiver defendants who are still in the case joined in the motion. The Lyles responded that the surface waiver agreements create a cloud on their title by claiming mineral rights in Section 14, when the signatories had no interest in Section 14. The Lyles further argued that Midway's Disclaimer of Interest did not fix the problem because it addressed a non-issue in the case, i.e., whether the agreements purported to give Midway the right to develop the mineral estate, and not whether the surface waiver defendant's themselves claimed rights to Section 14. In addition, the Lyles asserted that the altered surface waiver agreements were not effective, as they were not signed by the surface waiver defendants (and thus contravened the requirements of the Texas Property Code).

The trial court granted the motion for partial summary judgment through an order stating that the Disclaimer of Interest filed of record "removes any purported cloud on the title claimed by Plaintiff in Plaintiffs' Amended Petition; and . . . Midway Solar LLC shall record in the Official

---

[4] None of the remaining surface waiver defendants have entered an appearance in this appeal.

Public Records of Pecos County, Texas, a certified copy of this Order and provide a copy of this recorded Order to all parties."

Thereafter, the Lyles filed a cross-motion for partial summary judgment, seeking a declaration that they were entitled to a judgment quieting title and removing the surface waiver agreements from the public records, largely asserting the same arguments that the trial court had rejected when granting Midway's motion. The trial court denied this motion.

### 2. *The motions relevant to the trespass and contract claims*

#### a. The accommodation doctrine

In their second motion for partial summary judgment, Midway, joined by Drgac, argued that the "accommodation doctrine" controlled the surface and mineral owners use of the surface estate. As we explain in more detail below, that doctrine requires surface owners and mineral owners to reasonably accommodate each other in utilizing the surface for their competing estates. The parties' arguments over the application of the doctrine focus on whether the 1948 Deed that splits the surface and mineral estates already defines how the parties must accommodate each other's interests, such that the common law accommodation doctrine is inapplicable as a "gap filler." The trial court agreed with Midway and Drgac, granting their motion and expressly stating that "[t]he accommodation doctrine applies to the interpretation of the 1948 Deed."

#### b. The reasonableness issue

Thereafter, Midway and Drgac filed a third motion for partial summary judgment, which was brought as both a no-evidence and a traditional motion for summary judgment. The motion argued that under the accommodation doctrine, Midway owed no duty to the Lyles to accommodate their right to use the surface of Section 14 because the Lyles had not developed their mineral estate and had no current plans to do so. In the no-evidence portion of their motion, they

8

argued that without evidence of current use or plan to develop their estate, the Lyles lack valid claims for either trespass or breach of contract. And in the traditional portion of their motion, they argued that because the Lyles had not yet begun to use their mineral estate, Midway's use of the surface for purposes of operating the solar facility was "reasonable as a matter of law."

In response, the Lyles characterized Midway's argument as a challenge to whether their claims were "ripe" for review because they were not yet using their mineral estate. The Lyles argued, however, that they had already suffered a concrete injury by the construction of the solar facility over 70% of the surface on Section 14, which they claimed caused a diminution in value to their estate. In support of this argument, they attached two expert witness affidavits in support of their damage claim.

First, Kerry Pollard, a licensed petroleum engineer, avers that the construction of the solar facility "severely" affects the ability of an operator to develop any minerals from the estate. Pollard notes that in order to reach the minerals under the covered area, an operator would be required to use directional or horizontal drilling from the designated drilling sites. He states this would entail additional costs and risks that would be a "significant deterrent to anyone developing the minerals under the solar operations."[5] He opined that the solar facility does not "allow the mineral owners reasonable access to their mineral estate," and will "impede any future development" on the site.

---

[5]Vertical wells, as the name suggests, are drilled in a perpendicular direction from the surface and "predominated Texas's oil and gas production until relatively recently." *Green v. Chesapeake Expl., L.L.C.*, No. 02-17-00405-CV, 2018 WL 6565790, at *5 (Tex.App.--Fort Worth Dec. 13, 2018, no pet.) (mem. op., not designated for publication). Horizontal wells, in contrast, are initially drilled vertically, but then at a pre-determined point, the "drillstem deviates and proceeds horizontally into the targeted formation." *Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 633-36 (Tex.App.--Austin 2000, pet. denied).

9

In a second affidavit, William Temple, also a licensed professional engineer, expresses the opinion that oil and gas production in the general area shows the economic viability of the Lyles's mineral estate. But he further states that the most "attractive drilling prospects" for development are in the center of the south half of Section 14, which could accommodate four to six wells. However, that area is covered by the solar facility, and that the only way to access the minerals would be through drilling horizontal wells from the reserved drilling sites. Temple discounts the ability to horizontally drill given the geography in the area. As well, he noted that all production in the general area had been from vertical wells, and that there were no horizontal wells within 20 miles of the tract. And finally, he expresses his opinion that the two drilling sites reserved in the amended lease would be of little benefit to the Lyles because the 17-acre strip is too narrow to develop under the Texas Railroad Commission's spacing rules, and the 80-acre site is north of the most likely productive area on the property.

The Lyles argued that, at the least, their expert witness affidavits raise a question of fact regarding whether they had been denied access to their mineral interests due to the solar facility's operations on the surface of their estate, and whether they had suffered a compensable loss based on the diminished value of their mineral estate.

### C. The Trial Court's Final Judgment

The trial court granted Midway's third motion for partial summary judgment and thereafter entered a final take-nothing judgment against the Lyles. The trial court further stated that its judgment disposed of all the Lyles's claims, which would have included the claims against the surface waiver defendants who had not moved for summary judgment.

## III.  ISSUES ON APPEAL

The Lyles identify the overarching issue on appeal as whether the trial court erred in granting summary judgment.  *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970) (general point challenging summary judgment allows argument as to all the possible grounds upon which summary judgment should have been denied).  Under their general argument, the Lyles identify eight subsidiary questions.  In five related sub-issues, they argue that the trial court erred in granting summary judgment on their trespass and contract claims.  They contend the accommodation doctrine does not apply, but even if it does, they are denied access to their minerals, establishing a concrete injury.  They also contend that Midway failed to conclusively meet its evidentiary burden under the doctrine.

In other related sub-issues, the Lyles contend that the trial court erred by granting summary judgment on their quiet title claim (and for refusing their cross-motion for summary judgment on that claim), contending that the surface waiver agreements constituted clouds on their title, which had not yet been removed.  And in their final sub-issue, they contend that the trial court erred by granting summary judgment in favor of the remaining seven surface waiver defendants, as none of them had moved for summary judgment or for dismissal of the claims against them.

## IV.  STANDARD OF REVIEW

We review de novo the grant of a motion for summary judgment.  *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).  If a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion.  *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).  To defeat a no-evidence motion, the non-movant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements of its claims.  *Id.*  Conversely, a party moving for traditional summary

11

judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law. *Id.*, *citing* TEX.R.CIV.P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017).

For both no-evidence and traditional motions for summary judgment, we review the evidence in the light most favorable to the non-movant, and indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion. *Id.*, *citing City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *see also Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

When, as here, the opposing parties file cross-motions moving for summary judgment on the same issues, and the trial court grants one motion and denies the other, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *Merriman*, 407 S.W.3d at 248.

## V. THE TRESPASS AND BREACH OF CONTRACT CLAIMS

Midway's second and third partial motions for summary judgment collectively posit that the accommodation doctrine applies to this dispute and based on that doctrine, the Lyles must be actively attempting to develop the mineral estate. A supplemental motion makes the same argument addressed directly to the elements of the two claims that the Lyles asserted: trespass and breach of contract.

### A. Does the Accommodation Doctrine Apply?

In sub-issue five, the Lyles contend that the trial court erred in granting Midway's second motion for partial summary judgment in which it found that the accommodation doctrine applied

12

to the parties' dispute. We agree with Midway that the question of whether the accommodation doctrine applies here is the starting point for our resolution of the appeal. For the reasons set forth below, we also agree with Midway that the doctrine could apply under the property deed governing Section 14.

### 1. Overview of the accommodation doctrine

A fee simple interest in land includes both the surface estate and the mineral estate. *See Wenske v. Ealy*, 521 S.W.3d 791, 804 (Tex. 2017). Texas law recognizes that a landowner may sever the mineral and surface estates and convey them separately. *See Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60 (Tex. 2016). When the owner of a fee simple estate severs the mineral estate by a conveyance, five rights are conveyed to the transferee or grantee of the mineral estate: "(1) the right to develop, (2) the right to lease, (3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5) the right to receive royalty payments." *Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016), *quoting French v. Chevron U.S.A., Inc.*, 896 S.W.2d 795, 797 (Tex. 1995).

The mineral estate is typically referred to as the "dominant" estate in the sense that the mineral owner generally has the right to use the surface to extract minerals, as well as those incidental rights reasonably necessary for the extraction. *Merriman*, 407 S.W.3d at 248-49 In turn, the surface estate is referred to as the "servient" estate, because the mineral estate "receives the benefit of the implied right of use of the surface estate" to explore and develop its mineral interests. *See Coyote Lake Ranch*, 498 S.W.3d at 60, *citing* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1(1) (AM.LAW INST. 1998). Whether the mineral estate owner's right is expressly granted in a deed or contract, or implied by law, the right is born of simple logic, that "a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not

13

enter upon the land in order to explore for and extract the minerals granted or reserved." *Harris v. Currie*, 176 S.W.2d 302, 305 (Tex. 1943).

The rights accruing to the dominant mineral estate, while well-established under Texas law, are not absolute. *Lightning Oil Co.*, 520 S.W.3d at 48, *citing Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974). Over the years, this dominance has been limited by the "accommodation doctrine," as articulated by the Texas Supreme Court in *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971). The doctrine holds that the "mineral and surface estates must exercise their respective rights with due regard for the other's," and has in general provided a "sound and workable basis" for resolving conflicts between ownership interests. *See Coyote Lake Ranch*, 498 S.W.3d at 61, 63, *citing, inter alia*, *Brown v. Lundell*, 344 S.W.2d 863, 866 (Tex. 1961); *Warren Petrol. Corp. v. Martin*, 271 S.W.2d 410, 413 (Tex. 1954) ("Of course each [that is, the surface estate and the mineral estate] must exercise their respective rights of state with due regard for the rights of the other."). The accommodation doctrine was developed with the intent of balancing the rights of the surface owner and the mineral owner in the use of the surface. *Tarrant County Water Control & Improvement Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993).

Under the doctrine, the surface owner carries the burden to show that (1) the mineral owner's use of the surface completely precludes or substantially impairs the surface owner's existing use, and (2) there is no reasonable alternative method available to the surface owner by which the existing use can be continued. *Merriman*, 407 S.W.3d at 249. Upon doing so, the surface owner must "further prove that given the particular circumstances, there are alternative reasonable, customary, and industry-accepted methods available to the [mineral owner] which will

14

allow recovery of the minerals and also allow the surface owner to continue the existing use." *Id*., *citing Haupt*, 854 S.W.2d at 911-12.

If the surface owner can establish that the mineral owner has an available alternative that would allow it to reasonably access its minerals without disturbing the surface owner's existing use, the accommodation doctrine may require the adoption of that alternative method; however, when the evidence establishes that there is but one means of surface use by which to produce the minerals, then the mineral owner has the right to pursue that use, regardless of surface damage. *Haupt*, 854 S.W.2d at 912, *citing Getty Oil Co.*, 470 S.W.2d at 620; *see also Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 492 n.79 (Tex. 2011) (reaffirming the principle cited in *Haupt*).

Texas public policy also strongly favors freedom of contract. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 877 (Tex. 2018). Parties have the right to set their own contractual or deed terms as they see fit as long at their agreement does not violate the law or public policy. *See Coyote Lake Ranch*, 498 S.W.3d at 59. Thus, if the express terms of the parties' deed or contract determines the parties' rights, the accommodation doctrine will not apply. *Id.* at 56 (recognizing that the accommodation doctrine will apply to determine the rights between a mineral owner and a surface owner "absent an agreement to the contrary."), *citing Getty Oil*, 470 S.W.2d at 621 (applying accommodation doctrine to resolve complaint about lessee's use of tall oil pumps because the "lease contains no specific provision concerning the vertical usage of the land"). As Justice Boyd explained in his concurring opinion in *Coyote Lake Ranch*, when the parties' lease or deed expressly describes the "disputed rights" of the parties, it is unnecessary and even improper for a court to imply rights and obligations through the accommodation doctrine, as doing so would in essence rewrite the parties' agreement, adding terms to it, which a court has no authority to do. *Coyote Lake Ranch, LLC*, 498 S.W.3d at 66 (Boyd, J., concurring). However, when the parties'

15

deed or contract is silent or unclear on the parties' respective rights, or when there is substantial disagreement regarding the parties' intent in the terms used in a deed, the accommodation doctrine will be applied. *Id.* at 59-60, 67.

## 2. *The 1948 deed does not prevent application of the accommodation doctrine*

The Lyles contend that the 1948 Deed expressly describes their respective rights, making the application of the accommodation doctrine unnecessary and inappropriate. They base this conclusion on two provisions in the deed.

First, under the deed, "Grantors further reserve unto themselves, their heirs and assigns, the right to such use of the surface estate in the lands above described as may be *usual*, *necessary* or *convenient* in the use and enjoyment of the oil, gas, and general mineral estate hereinabove reserved." (emphasis supplied) In analyzing this provision, the Lyles recognize that when a deed gives a mineral owner the right to use the surface of an estate in a manner that is "necessary" or "convenient," courts have found that these terms are imprecise, leaving "substantial room for disagreement" as to their meaning; therefore, if those were the only terms used, the Lyles concede that the accommodation doctrine would determine the parties' respective rights. *See Coyote Lake Ranch*, 498 S.W.3d at 67 (Boyd, J., concurring), *citing Merriman*, 407 S.W.3d at 249 (applying the accommodation doctrine to a lease that permitted the lessee to use the surface as necessary or useful in its operations); *Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 100, 103 (Tex. 1984) (applying the accommodation doctrine when deed conveyed "all necessary and convenient" easements to the mineral estate owner for the purpose of developing its estate).

However, the Lyles contend that the use of the term "usual" in the deed clearly and objectively defined the parties' rights, arguing that it expressed the grantors' intent to reserve to themselves the right to use vertical drilling, which was the "usual" method of drilling at the time

16

the deed was signed. The Lyles urge that in 1948, "directional drilling was, at best, unusual, and horizontal drilling hadn't even been invented." Their expert witnesses averred that vertical drilling is currently the usual form of drilling in the area, and has been since the early 1970's. Accordingly, they contend that the deed expressly gives them the right to use vertical drilling, and that it would be improper to apply the accommodation doctrine which might potentially limit that right. We disagree for several reasons.

First, the deed did not use the term "usual" in the specific context of drilling methods and did not expressly give the grantors the right to use any particular drilling method in the development of their estate. Instead, the deed used the term "usual" in a more general sense, giving the grantors the right to "use" the surface in the "usual" manner in the "use and enjoyment" of the reserved mineral estate. Further, the deed does not make it clear whether the grantors intended the term "usual" to apply to the methods of extracting minerals used in 1948, or as those methods might evolve over time. Accordingly, there is room for substantial disagreement as to what the grantors meant in using that term.

In reaching this conclusion, we recognize, that when searching for the definition of a term used in a deed or other conveying document, a court must generally look to the manner in which the term was defined or used at the time of the conveyance. *See, e.g.*, *Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex. 1987); *W. Texas Utilities Co. v. Lee*, 26 S.W.2d 457, 458 (Tex.App.--Austin 1930, no writ). However, there is simply no way for us to determine with any certainty what the grantors meant when they used the term "usual" in the deed. Had they intended to specify a particular drilling method, there was an easy way to do so: just say the mineral estate is entitled to drill a vertical well wherever it chooses. Instead, they used a term capable of different meanings, and "usual" is no more precise than "necessary" or "convenient" which courts have already found

17

to lack precision. *Coyote Lake Ranch*, 498 S.W.3d at 67 (Boyd, J., concurring).[6] That is, a person could just as easily describe vertical drilling as "necessary" or "convenient", yet those terms would not supplant the accommodation doctrine. And adding the term "usual" is no more descriptive than what the accommodation doctrine already requires: an alternative method to recover the minerals that is reasonable, customary, and industry accepted. *Haupt*, 854 S.W.2d at 911-12.

Nor do we believe that the second provision in the deed, which the Lyles refer to as the "elimination-of-liability" provision, would dictate how the parties intended to resolve disputes of this nature. That provision states:

> And neither Grantors herein nor their heirs, assigns, successors in title, nor any persons holding or claiming under them shall ever be liable to Grantees herein, their heirs, assigns, and successors in title for any damage or injury to the surface estate by reason of such use or for any damage or injury resulting from or claimed to have resulted from the exercise of the rights and privileges hereinabove reserved in connection with the reservation of the oil, gas, and general mineral estate.

From this clause, the Lyles reason they could destroy any surface obstruction without liability which negates any basis for accommodating competing surface uses. Yet the clause only relieves the Lyles from liability for exercising "the rights and privileges hereinabove reserved[.]" As such, this particular clause does not define the limits of those rights and privileges. Accordingly, the clause states little more than what the common law would already require. *See Humble Oil & Refining Co. v. Williams*, 420 S.W.2d 133, 134 (Tex. 1967) (holding that a mineral owner is not liable for surface damage in connection with oil and gas operations on the property except in cases of negligence or excessive use). We read the clause only to address what would occur in the event

---

[6] The Court in *Coyote Lake Ranch* reached that result even though the deed there expressly provided that the City "may at any time and location drill water wells and test wells on said lands." 498 S.W.3d at 57.

18

that the mineral owners damaged the surface--it does not conversely address the surface owner's rights to use the surface, nor does it purport to restrict or limit their rights in any way.

We conclude that the 1948 deed does not preclude the application of the accommodation doctrine. Accordingly, the doctrine will inform our determination of what rights, if any, the Lyles have to complain about Midway's allegedly excessive use of the surface above their estate. To the extent they rely on the 1948 deed to negate the accommodation doctrine, the Lyles sub-issue five is overruled.

### B. Must the Lyles Attempt to Develop their Minerals to Maintain a Claim?

But the potential application of the accommodation doctrine only brings us to the centerpiece of the dispute. In their first sub-issue, the Lyles challenge Midway's claim that they must be currently using or planning to use the surface of their estate for mineral development to maintain the claims asserted. The Lyles characterize Midway's argument as raising a ripeness challenge, which in essence argues that because the Lyles have not yet begun using their mineral estate, the court lacks a case-in-controversy.[7] They contend, however, that their claims were ripe for review, as they had already suffered damage as the result of Midway's actions in constructing the solar facility on the surface covering their mineral estate. At the same time, the record is undisputed that the Lyles have not actively sought to develop their minerals and at present have no plans to do so. The Lyles respond that this is because they cannot realistically pursue mineral development when the solar field covers 70% of the section's acreage.

---

[7] In order for a trial court to have subject matter jurisdiction over a plaintiff's claim, the claim must be "ripe" for review. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020) (a case must be ripe for the trial court to have subject matter jurisdiction); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993) (recognizing that the doctrine of ripeness is a threshold issue implicating subject matter jurisdiction, which is essential to the authority of a court to decide a case).

The parties' legal arguments diverge on their interpretation of two Texas Supreme Court decisions. The Lyles direct us to the Texas Supreme Court's decision in *Haupt*. In that case, the plaintiffs owned the minerals under an 80-acre tract owned by the Tarrant County Water District. *Haupt*, 854 S.W.2d at 910. After the District flooded the surface of all but 12 acres of the tract to create a reservoir, the mineral estate owners brought an inverse condemnation case against the District, alleging that its actions constituted a taking for which they were entitled to damages. *Id.* The trial court ruled against the mineral owners, finding that they retained access to their minerals even after the flooding, but the Waco Court of Appeals reversed, finding that a taking had occurred, because of the partial but permanent restriction of access to the minerals that had resulted from the flooding. *Id.*

The Texas Supreme Court reversed and remanded the case, finding that the court of appeals had failed to apply the accommodation doctrine. *Id.* Important to our analysis, it said the court of appeals should have applied the accommodation doctrine "before a court may determine that an inverse condemnation of the mineral estate has occurred." *Id.* at 909. In other words, the accommodation doctrine is considered before reaching the elements of a relevant cause of action.

The underlying facts in *Haupt* draw a close parallel to the dispute before us. In *Haupt*, the evidence at trial had established that the District's use of the surface to create the reservoir was reasonable, but that the reservoir had deprived the mineral owners from being able to access their minerals through vertical drilling from the surface. *Id.* at 912. However, the court identified the question as whether the mineral owners had any reasonable alternative drilling methods available to them that would both protect the reservoir, while at the same time affording the mineral owner's reasonable access to their minerals. *Id.* at 912-13. The court defined an alternate means as a

reasonable, industry-established, alternative method that would allow the mineral owner access to its minerals while still protecting the surface owner's existing use. *Id.*

The parties in *Haupt* had presented conflicting evidence regarding the economic viability of the alternative drilling methods available, which included the possibility of drilling directionally or from a platform built on an adjoining tract of land. *Id*. at 913. On remand the court of appeals was directed to determine whether the trial court's finding that the plaintiffs had access to their minerals was supported by factually sufficient evidence "in light of the accommodation doctrine." *Id.* at 913. And the court expressly noted that if the minerals could only reasonably be produced through surface drilling, the lessee had the right to pursue its claim for inverse condemnation damages under the accommodation doctrine. *Id*. at 913, *citing Getty*, 470 S.W.2d at 622. On remand, the Waco court concluded that while the evidence supported the conclusion that there was an alternative means to access the minerals (i.e., horizontal drilling or a marine platform), the evidence was insufficient to support those alternatives as reasonable. *Haupt, Inc. v. Tarrant County Water Control & Imp. Dist. No. One*, 870 S.W.2d 350, 355 (Tex.App.--Waco 1994, no writ). From the *Haupt* cases, the Lyles reason that constructing an impediment on the surface that blocks mineral development is sufficient to justify a claim for damages.

But Midway responds that the mineral owner in *Haupt* was actively seeking to develop the mineral estate. The mineral owner had attempted to re-enter several plugged wells and employ directional drilling, until the water district obtained an injunction preventing further efforts. *Id*. at 910. And Midway points us to other cases following *Haupt* where the parties were also actively trying to develop their minerals.[8]

---

[8] The Lyles respond that these other cases involved claims for injunctive relief where imminent and irreparable injury are core elements of the relief sought and which by necessity presuppose some on-going activity. *See, e.g.*, *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 247 (Tex. 2013) (surface owner brought an action against a mineral owner's

To make its case, Midway principally relies on language from a more recent Texas Supreme Court decision, *Lightning Oil Co.*, 520 S.W.3d at 52. In that case, Anadarko had a mineral lease that only allowed it to access its minerals from off-site locations through horizontal drilling. *Id.* at 43. To do so, Anadarko obtained a lease from the surface owner of an adjacent ranch, allowing it to drill from the surface of the ranch. *Id.* Lightning Oil, the lessee of the mineral estate under that ranch, however, brought trespass claims and sought to enjoin Anadarko from drilling from the ranch. *Id.* In particular, Lightning Oil complained that Anadarko's drilling would pass through portions of its mineral-bearing formations. *Id.* Part of Lightning Oil's argument was that Anadarko's proposed eight-inch diameter pipe running several thousand feet through Lightning's Oil's lease could potentially disrupt Lightning Oils' future development of the property. The Texas Supreme Court rejected that rationale, however, writing:

> [The mineral interest owner's] argument is essentially that it should have the right to prevent any surface or subsurface use that might later interfere with its plans. Such a decision would render the mineral estate absolutely dominant and significantly alter the balance achieved through the flexible nature of the accommodation doctrine. . . . We decline the invitation to alter oil and gas law in such a drastic manner.

*Id.* at 39. Parsed in terms of this case, Midway claims its solar field might only potentially interfere with the Lyles's mineral interest at some point in the future, but until it actually does so, the Lyle's cannot have the unilateral right to dictate the use of the surface.

---

lessee seeking an injunction to move a well); *Tex. Genco, LP v. Valence Operating Co.*, 187 S.W.3d 118, 120 (Tex.App.--Waco 2006, pet. denied) (surface owner brought action seeking a permanent injunction to prohibit mineral estate owner from engaging in drilling that interfered with its existing disposal landfill); *Pharaoh Oil & Gas, Inc. v. Ranchero Esperanza, Ltd.*, 343 S.W.3d 875, 877 (Tex.App.--El Paso 2011, no pet.) (surface owner sought a temporary injunction prohibiting an oil and gas operator from storing equipment and materials on the surface that interfered with its ranching activities); *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 619-20 (Tex. 1971) (surface owner brought action to restrain oil and gas lessee from using vertical space for pumping units that it claimed prevented its existing use of an automatic irrigation sprinkler system on its farm). The Lyles contend that no claim for injunctive relief is presently before us.

Neither of these cases directly answers the question of whether Midway must accommodate the Lyles' potential use of the property before the Lyles actually seek to use it. Ultimately the answer to that question lies in a proposition of logic, as much as one of law. Midway has the right to use the surface. The Lyles also have the right to use the surface, but only as an adjunct to their mineral estate. If the Lyles exercise their right as part of developing the minerals, Midway must yield to the degree mandated by the application of the accommodation doctrine. But if the Lyles are not exercising their right, there is nothing to be accommodated. Stated otherwise, until the Lyles seek to develop their minerals, Midway owes no duty to the Lyles respecting the surface usage.

Were it otherwise a mineral owner who undertakes no efforts to develop the mineral estate could claim damages from any surface activities that might hinder--at some point in the future-- the exploration for oil and gas. And under the Lyles's theory, how would the value of the mineral estate be calculated. Presumably, the diminished value in today's dollars could be estimated by multiplying the available minerals times the market price, minus the cost of development. But if the Lyles do not actually seek to develop those minerals until sometime in the future, be it five, ten, or twenty years hence, all those variables would change depending on the market and technology. There is simply no logic in allowing trespass damages today for a mineral estate that might never be developed.

To be sure, the Lyles urge that they cannot realistically develop their estate given that 70% of the surface of the tract is covered in solar panels. Texas law does not require the performance of a futile act. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594-95 (Tex. 2008) (collecting cases for principle that when seller refuses to close on property, buyer is generally excused from useless act of tendering purchase price to obtain specific performance). And while that argument might

23

eventually be borne out by evidence that the Lyles have unsuccessfully sought to market a lease, or otherwise develop the minerals, none of that kind of evidence is in our record. Rather, the Lyles candidly concede in their brief that "it is true that appellants do not have current mineral development plans."

We reach this conclusion under the accommodation doctrine. But even if we have erred in applying the accommodation doctrine here, the result would not change. The lack of an actual effort to develop the minerals by the Lyles similarly undermines both of their pleaded claims. In general, a trespass to real property occurs when a person enters another's land without consent. *See Pharaoh Oil & Gas, Inc. v. Ranchero Esperanza, Ltd.*, 343 S.W.3d 875, 882 (Tex.App.--El Paso 2011, no pet.). "To recover damages for trespass to real property, a plaintiff must prove that (1) the plaintiff owns or has a lawful right to possess real property, (2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary, and (3) the defendant's trespass caused injury to the plaintiff." *Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex.App.--Fort Worth 2006, pet. denied). Given that both parties have rights to the surface, Midway has not encroached on the Lyles surface rights until the Lyles actually seek to exercise their rights.

The second pleaded claim--breach of the 1948 deed--is a breach of contract claim. Its elements include the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant, and damages resulting from that breach. *See, e.g.*, *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex.App.--El Paso 2000, no pet.). And under the property deed, the Lyles have the right to access the property for the purpose of mineral development, but they have never actually asked to enter the property for that purpose.[9]

---

[9] As a part of the litigation, the Lyles asked to inspect the property, which Midway declined, but it did so because the request was litigation based, and not as an adjunct to developing the Lyles' minerals.

24

We therefore conclude that any trespass or breach of contract claim is premature until such time as the Lyles actually seek to develop their mineral estate. On our record, they have taken no steps in that direction, which belies any actual conflicting use of the property. Given that there is no controversy over that aspect of the case at this time, the trial court should have dismissed the trespass and breach of contract claims without prejudice. *See Beinar v. Deegan*, 432 S.W.3d 398, 414 (Tex.App.--Dallas 2014, no pet.) (after determining that negligence claim was unripe, court lacked subject matter jurisdiction and dismissal without prejudice was required). We reform that portion of the judgment accordingly.

The Lyles' sub-issue one is overruled except as stated with respect to reforming the judgment. In sub-issue two, three, and four, the Lyles challenge the trial court's order granting summary judgment on the trespass and breach of contract claims based on deficiencies in Midway's evidence of an alternate means to develop the minerals. Given our disposition of the first sub-issue, we need not reach those issues.

## VI. THE QUIET TITLE CLAIM

In their sixth and seventh sub-issues, the Lyles argue that the trial court erred by granting Midway's motion for summary judgment on their claim for quiet title, and conversely, the court should have granted their motion for summary judgment on the same issue. In particular, they argue that the surface waiver agreements that Midway obtained from the defendant mineral owners on adjacent tracts created a cloud on their title because the agreements purported to relinquish the right to use the surface on Section 14 for mineral development, implying or expressly stating those defendants held such rights. And given the invalidity of the agreements, the Lyles contend that they were entitled to a judgment expressly declaring the surface waivers to be invalid and void, and ordering their removal from the public records, in order to quiet their title. In response,

25

Midway contends (1) the waivers do not create a cloud on the Lyles' title; (2) even if they did, any purported cloud was removed by filing (a) correction instruments, (b) a Disclaimer of Interest, and (3) by the trial court's order stating that Midway's disclaimer removed any purported cloud on the title. We agree with the Lyles, however, that these actions did not "fix" the problem created by the surface waiver agreements, and that some, but not all, of the surface waiver agreements have created clouds on the Lyles' title, that have not yet been removed, thereby entitling them to a declaration quieting their title.

## A. When is a Party Entitled to a Declaration Quieting its Title?

A plaintiff seeking to quiet title must establish the following: (1) it has an interest in a specific property, (2) title to the property is affected by a claim by the defendant, and (3) the defendant's claim, though facially valid, is in fact invalid or unenforceable. *See Heredia v. Zimprich*, 559 S.W.3d 223, 233 (Tex.App.--El Paso 2018, no pet.); *see also Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex.App.--El Paso 2012, pet. denied). A quiet-title suit is an equitable action that exists "to enable the holder of the feeblest equity to remove from his way to legal title any unlawful hindrance having the appearance of better right." *Lance v. Robinson*, 543 S.W.3d 723, 739 (Tex. 2018), *quoting Bell v. Ott*, 606 S.W.2d 942, 952 (Tex.App.--Waco 1980, writ ref'd n.r.e.).

To create a cloud on a title, the invalid claim, whether it be made by deed, contract, judgment, or other instrument, must appear facially valid; if it is void on its face, it has no power to affect the title or to otherwise prejudice the plaintiff, and it therefore does not create a cloud. *See Hahn v. Love*, 321 S.W.3d 517, 531 (Tex.App.--Houston [1st Dist.] 2009, pet. denied). Thus, the claim must purport to convey an interest or make a charge upon the land of a true owner, the invalidity of which can only be revealed by resorting to additional proof or extrinsic evidence.

26

*See Id.* at 531 (any claim not void on its face that "purports to convey an interest in or make any charge upon the land of a true owner, the invalidity of which would require proof, is a cloud upon the legal title of the owner."); *Best Inv. Co. v. Parkhill*, 429 S.W.2d 531, 534 (Tex.App.--Corpus Christi 1968, writ dism'd) (a cloud on title exists where "extrinsic proof" is needed to show its invalidity).

**B. Did the Surface Waiver Agreements Create a Cloud on the Lyles' Title?**

It is undisputed that the Lyles own a portion of the mineral estate underlying the surface in the southern half of Section 14, and that the twenty mineral estate owners who signed the surface waiver agreements do not. The text of the surface waiver agreements vary and fall into one of the following three categories.

### *1. Agreements that claim mineral rights in lands covered by the leases*

In the first category, seven mineral owners stated that they owned a mineral interest under the "Surface Lands" described in Midway's Leases signed by both of the Drgac brothers, and agreed to "waive[], release[] and relinquish[] all of [their] rights to use the surface of the "'Surface Lands'" for any purpose related to mineral production. Although the two leases were not attached, the agreements referenced the leases and gave their locations in the public records. The Leases covered Section 14. But none of these seven mineral owners had any interest in Section 14. Of the seven mineral owners who signed this type of agreement, two remain in the case (Carol D. Sweeney and Glen V. Duston).

These agreements cast a cloud on the Lyles' title to the mineral estate located in Section 14. On their face, the other mineral owners claim a mineral interest in Section 14, when they had none. The invalidity of these agreements could only be discerned by additional research and the use of extraneous documents to determine what interests the mineral owners actually held.

27

Further, as Midway never sought to correct or alter any of these agreements, we conclude that standing alone, they constitute a continuing cloud on the Lyles' title.

### 2. *Agreements that define the signer's mineral rights*

In the second category of agreements, three mineral owners stated that they had interests "under some portion of or all of the Surface Lands" described in the two Midway Leases, and provided the location of the leases in the public records. However, the waiver also states that the legal description of the land subject to the mineral owners' ownership was defined in an Exhibit A. In turn, that exhibit expressly stated that the mineral owners only had interests in Sections 71 and 77. The Lyles focus on other language, however, that state that although the mineral owners were relinquishing their right to use the surface area of their estates, they were reserving "Drillsite Areas," as described in Exhibit B. Exhibit B, in turn, described reserved drill site locations on Sections 71, 77 and as important to this case, Section 14. However, Exhibit B also expressly stated that the mineral owner "may use a Drillsite Area only to the extent Mineral Owner holds ownership within the tract of land in which each Drillsite Area is situated."

Given the express limitations in these agreements and in the attached exhibits, the mineral owners were not attempting to claim any interest in Section 14. Accordingly, regardless of the validity of the alterations that were later made to these agreements, we conclude that they do not constitute a cloud on the Lyles' title. Three of the mineral owners who signed this type of lease (Ralph H. Perry III, Stephen W. Miller, and Susan Madeley Stevenson) remain as defendants in the case. We affirm the summary judgment as it pertains to Midway's and Drgac's claimed liability for these mineral owners.

28

### 3. *Agreements that claim rights in the "drill site reservations"*

In the third category of agreements, ten mineral owners stated that they owned mineral interests under "some portion of or all" of the "Surface Land" described in the two Midway Leases, and similarly provided the location of the two leases in the public records. These agreements did not provide any legal description of the interests that the mineral owners' actually owned. And this form of agreement also stated: "Mineral Owner reserves for itself, its successors and assigns the non-exclusive right to use the Surface Lands within the Drillsite Areas for purposes of exploring for, developing, drilling for, extracting, or transporting Minerals [subject to several limitations, not germane here]." The drillsite areas were defined in an attached exhibit as areas in Sections 71, 77 and as relevant here, Section 14. Again, none of the mineral owners had any interest in Section 14. Of the ten mineral owners who signed this type of waiver, two remain in the lawsuit at this time (the Joanne L. Marren Declaration Trust and Jan C. Ice).

Because these agreements--unlike those in category two--did not clarify the mineral owners' interest, and did not clearly state that they had no interest in Section 14, they create a cloud on the Lyles' title. However, after the Lyles complained to Midway about these agreements, Midway altered the agreements by crossing out on the exhibit the references to drilling site reservations located on Section 14. Midway contends that this alteration clarified that the mineral owners were not claiming an interest in Section 14. The Lyles point out several problems with this argument, one of which we find persuasive: none of the agreements were properly corrected or re-recorded in accordance with the Property Code.

The Property Code contains two different provisions that allow parties to file "correction instruments" to correct previously recorded instruments of conveyance: one for correction of nonmaterial errors and one for material corrections. *See* TEX.PROP.CODE ANN. § 5.028-29; *see*

29

*also Heredia*, 559 S.W.3d at 230. The parties dispute which provision applies, and whether Midway fulfilled the requirements of those provisions when it filed the corrected surface waiver agreements. The Lyles contend that the material change provision applies because the correction involved "remov[ing] land from a conveyance." *See* TEX.PROP.CODE ANN. § 5.029(a)(2) (providing that an instrument to "remove land from a conveyance that correctly conveys other land" is considered a material correction under the Code). And they contend that the altered instruments did just that, by removing the Section 14 drill site reservation from the original conveyance. Further, when a correction instrument makes a material change to the original instrument, it must be "executed by each party to the recorded original instrument of conveyance." *See Id*. § 5.029(b)(1). And because the mineral owners never executed the correction instruments, the Lyles contend that the correction instruments were invalid. We agree that the removal of Section 14 removed land from the conveyance, and Section 5.029 applies, but was not complied with.

Moreover, even if we concluded that the change was non-material--and thus sanctioned by Section 5.028--its technical requirements were similarly not met. Section 5.028 of the Code governs nonmaterial changes and would not require the mineral owners' signatures. *See Id*. § 5.028(1)(a). But it requires that a "person who executes a correction instrument under this section shall disclose in the instrument the basis for the person's personal knowledge of the facts relevant to the correction of the recorded original instrument of conveyance." *Id*. § 5.028(c). The altered waiver agreements do not include any such disclosure. Instead, the correction instruments contain cover sheets with the following statement: "The attached Drill Site Reservation and Partial Waiver of Surface Rights was originally recorded on [Date] in the Official Public Records of Pecos County, Texas as Instrument No. [] and is being re-recorded to attach the

30

correct Exhibit B to the document." There is no indication of who made the correction, or the basis for that person's knowledge of the facts relevant to the correction. Therefore, whether we categorize the correction instruments as being material or nonmaterial, we conclude that they did not meet the requirements of either provision in the Property Code and were therefore of no force or effect. *See, e.g.*, *Tanya L. McCabe Tr. v. Ranger Energy LLC*, 531 S.W.3d 783, 799 (Tex.App.--Houston [1st Dist.] 2016, pet. denied) (revised deed that did not satisfy the correction statute was not enforceable). Accordingly, for the reasons set forth above, we conclude that the surface waiver agreements in this category still cloud the Lyles' title.

### C. The Effect of Midway's Disclaimer of Interest

After the Lyles filed suit, Midway filed a "Disclaimer of Interest," in which it referred to the twenty surface waiver agreements under consideration, and stated that the agreements did not "grant, convey or transfer to Midway any right, title or interest in or to the mineral estate of Section 14." In the trial court, as well as on appeal, Midway contends that this disclaimer "removed any purported cloud" on the Lyles' title. As the Lyles point out, however, the surface waiver agreements did not purport to give Midway any right to develop the mineral estate in Section 14. Instead, the mineral owners who signed the offending surface waiver we identify above purport to claim an interest in Section 14. Midway's Disclaimer of Interest of its interest could not correct that problem.

### D. The Effect of the Trial Court's Order

Similarly, we disagree with Midway's argument that the trial court's order cleared up any confusion created by the surface waiver agreements. The trial court's order granting Midway's motion for summary judgment states that Midway's disclaimer removed "any purported cloud on the title claimed by Plaintiff in Plaintiffs' Amended Petition[.]" We have already concluded,

31

however, that the disclaimer did not in fact clear up the confusion caused by the surface waiver agreements. Moreover, the order itself only refers the reader to another document which is not part of the deed records. That is, if a title researcher were looking at title fifty years hence, they would have to locate the amended petition to discern the allegations being asserted.

While it is evident that Midway tried to remedy the discrepancies created in some of the twenty waiver agreements, it did not clearly do so, and has left a cloud on the Lyles' title with respect to four of the waiver agreements (Carol D. Sweeney, Glen V. Duston, the Joanne L. Marren Declaration Trust and Jan C. Ice).

Appellants' sub-issue six and seven are sustained in part.

## VII. DISMISSAL OF THE SEVEN SURFACE WAIVER DEFENDANTS

In its last sub-issue, the Lyles argue that the trial court erred in granting summary judgment in favor of the surface waiver defendants--who were not dismissed voluntarily--as none of them moved for summary judgment and none joined in Midway's motion. We agree.

A trial court lacks the authority to grant summary judgment in favor of a party who did not move for summary judgment. *See Wassmer v. Hopper*, 463 S.W.3d 513, 529 (Tex.App.--El Paso 2014, no pet.) (where party did not move for judgment on its pleadings or join in the pleadings of the parties who did move for judgment, the trial court had no authority to grant judgment in its favor), *citing Teer v. Duddlesten*, 664 S.W.2d 702, 703-04 (Tex. 1984) (trial court may not grant summary judgment in favor of party that did not move for summary judgment); *Young v. Hodde*, 682 S.W.2d 236, 237 (Tex. 1984) (agreeing with the court of appeals' conclusion that the trial court erred in rendering take-nothing judgment against respondent's counterclaim in the absence of a motion for summary judgment by petitioner seeking that relief).

Midway concedes this point and acknowledges that the surface waiver defendants did not join in their motion for partial summary judgment, nor file any independent motions of their own. However, they argue that if we affirm the trial court's summary judgment dismissing the Lyles' quiet title claim with respect to Midway and Drgac, we should affirm that decision as to all of the surface waiver defendants, as a matter of equity and to preserve judicial resources. Midway has not cited any authority that would purport to give us any authority to dismiss the three defendants without a motion filed by them or on their behalf. We therefore decline the request to do so.

The Lyles' sub-issue eight is sustained.

## VIII. CONCLUSION

For the reasons set forth above, we conclude that the trial court did not err in granting summary judgment on the Lyles' claims for trespass and breach of contract but should have made its dismissal without prejudice. The trial court erred in granting summary judgment to Midway and Drgac on the Lyles's claim for quiet title as it pertains to the waiver forms for Carol D. Sweeney, Glen V. Duston, the Joanne L. Marren Declaration Trust and Jan C. Ice. It did not err in granting summary judgment to Midway and Drgac on the quiet title claim germane to the waiver forms for Ralph H. Perry III, Stephen W. Miller, and Susan Madeley Stevenson. In addition, we conclude that the trial court erred in refusing to grant the Lyles' cross-motion for summary judgment on their request for declaratory relief on their quiet title claim, with respect to all but the three surface waiver agreements identified above. The trial court erred in granting summary judgment for all the surface waiver defendants individually because they never moved for summary judgment.

We therefore remand the matter to the trial court for the entry of an appropriate judgment quieting title in the Lyles' mineral estate.

33

JEFF ALLEY, Chief Justice

December 30, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.